

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

IN RE CAPITAL ONE DERIVATIVE ) Lead Case No. 1:12cv1100
SHAREHOLDER LITIGATION )
)

## MEMORANDUM OPINION

This removed shareholder derivative action presents the question whether state law claims brought against officers and directors of Capital One for breach of fiduciary duty, corporate waste, and unjust enrichment "aris[e] under the Constitution, laws or treaties of the United States," where the state claims are based on directors' and officers' failure to prevent alleged violations of federal consumer protection laws. *See* 28 U.S.C. § 1331. Plaintiffs seek a remand to state court, contending that no substantial, unresolved federal question exists to warrant removal of plaintiffs' state law claims.

For the reasons that follow, plaintiffs' motion for remand of this case must be denied inasmuch as disposition of plaintiffs' state claims necessarily depends on resolution of disputed and substantial questions of federal law, and the exercise of federal jurisdiction in this matter will not disrupt the proper balance of federal and state interests.

I.[1]

Plaintiffs Iron Workers Mid-South Pension Fund and Kim Barovic filed separate complaints in the Circuit Court of Fairfax County, Virginia. These complaints are essentially identical, naming the same defendants, and alleging the same causes of action. Both cases were

---

[1] The facts recited here are derived from the complaints filed in the Circuit Court of Fairfax County, Virginia and from the parties' briefs addressing the remand motion.

1

removed to this district where they have been consolidated. *In re Capital One Derivative Shareholder Litig.*, 1:12cv1100 (E.D. Va. Nov. 30, 2012) (Order). Both plaintiffs held shares of Capital One stock at the time of the alleged wrongdoing, and both continue to hold Capital One shares.

The nominal defendant, Capital One Financial Corporation ("Capital One"), is a publicly-traded Delaware corporation headquartered in McLean, Virginia. Capital One is the parent company of Capital One Bank (USA) (the "Bank"), which is one of the country's largest consumer credit and debit card issuers.[2] The Bank also markets and sells credit card "add-on" products, such as Payment Protection and Credit Monitoring.

Plaintiffs named thirteen individual defendants, all of whom are either directors, officers, or both, of Capital One. Only defendant Richard D. Fairbank is both a director and an officer. He has been a director of Capital One since 1994 and is also Capital One's Chief Executive Officer and President. In addition to Fairbank, the complaints name as defendants seven other current Capital One directors: W. Roland Dietz, Patrick W. Gross, Ann Fritz Hackett, Lewis Hay, III, Pierre E. Leroy, Mayo A. Shattuck, III, and Bradford H. Warner. The complaints also name as a defendant a former director, Edward R. Campbell, a director of Capital One from 2005 until May of 2012. In addition to serving on Capital One's board of directors, these named individual defendants also serve on the various board committees.

---

[2] It should be noted that the complaints identify Capital One and the Bank as separate entities, but then do not distinguish between Capital One and the Bank in discussing the consent orders or the liability of the officers and directors. The suit is brought against the directors and officers of Capital One, but the Bank is the entity alleged to have been harmed. This is known as a double derivative suit. *See Sternberg v. O'Neil*, 550 A.2d 1105, 1107 n. 1 (Del. 1988) (defining a double derivative action as "a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary company"). This issue may be explored more extensively in deciding the pending motions to dismiss.

In addition to naming the directors listed above as defendants, the complaints also name as defendants the following Capital One officers: Peter A. Schnall, the Chief Risk Officer since 2006, and prior to that the Chief Credit Officer; Ryan M. Schneider, the President of Capital One's Card division since 2007, and an Executive Vice President prior to that time; Sanjiv Yajnik, the President of Financial Services since 2009, and an employee of Capital One's European and Canadian credit card businesses from 1998 until 2009; and Gary L. Perlin, the Chief Financial Officer since 2003.

Plaintiffs allege that these directors and officers breached their fiduciary duty of loyalty to Capital One, engaged in corporate waste, and were unjustly enriched because they allowed the Bank to engage in various deceptive and illegal practices related to two of its "add-on" products thereby violating federal consumer protection laws. The fiduciary duty, corporate waste, and unjust enrichment claims are all Delaware state law claims. The implicated "add-on" products are known as "Payment Protection" and "Credit Monitoring". Payment Protection allows a customer to cancel up to twelve months of minimum payments on the customer's credit card if the customer becomes unemployed or temporarily disabled. Credit Monitoring provides a package of consumer services including identity theft protection, daily credit monitoring, and notification of suspicious credit transactions.

The complaints allege that the Bank entered into two consent orders that are at the heart of plaintiffs' claims. First, the Bank entered into a consent order with the Office of the Comptroller of the Currency (the "OCC"), in which the OCC found that by reason of certain marketing, sales, and retention practices, the Bank engaged in "unfair and deceptive practices" under Sections 5 and 6 of the Federal Trade Commission Act[3] and that "by failing to maintain

effective risk management and control processes," the Bank violated 12 C.F.R. § 37.8. Compl., at ¶ 38 (quoting OCC Consent Order, at 6-7). Second, the Bank entered into a consent order with the Consumer Financial Protection Bureau (the "CFPB"), which found that the Bank violated Sections 1031 and 1036 of the Consumer Financial Protection Act[4] in connection with the marketing, sales, and operations of the Bank's Payment Protection and Credit Monitoring products.

As part of the OCC and CFPB consent orders, the Bank was required (i) to pay approximately $210 million in damages and fines, and (ii) to implement better control procedures designed to prevent such problems in the future. Specifically, the Bank had to refund approximately $143 million to nearly two million customers impacted by the Payment Protection and Credit Monitoring sales and retention practices, as well as $7 million to customers impacted by the Bank's billing practices for the Credit Monitoring products. The Bank was also required to pay $25 million in civil penalties to the CFPB and $35 million in civil penalties to the OCC.

Plaintiffs allege, based on the OCC and CFPB consent orders, that between 2010 and early 2012, when customers with low credit scores or low credit limits called to activate newly-issued or reissued credit cards, those customers were routed to third party vendors' call centers.[5] Customers were also routed to these third-party vendors' call centers when they called to cancel enrollment in the Payment Protection and Credit Monitoring programs. Third party vendors' employees at the call centers marketed and sold the Payment Protection and Credit Monitoring

---

[3] 15 U.S.C. § 45(a)(1).

[4] 12 U.S.C. § 5536

[5] The record does not reflect, nor—surprisingly—did Capital One's counsel know, either the location of the allegedly offending call centers or the nature of the legal relationship between the call centers and the Bank.

products during the activation phone calls and tried to retain the customers in these add-on programs during the cancellation phone calls. Plaintiffs allege, based on the Agencies' findings, that the vendors used "high-pressure sales [and retention] tactics and made materially false, deceptive, or otherwise misleading oral statements relating to the costs, coverage terms, benefits, and other features of the Payment Protection and Intersections Credit Monitoring products" during these telephone calls. Compl. at ¶ 36 (quoting the OCCs' Consent Order, at 4-5).

Citing the CFPB consent order, plaintiffs allege that the Bank's customers were misled by the call centers about the benefits of enrolling in these add-on products, including being told by call center personnel that purchasing the products would improve their credit scores and help them increase their limits on their Capital One credit cards. Plaintiffs allege that customers were not always told that purchasing the products was optional and that some customers were told they had to purchase the products in order to receive full information on the products. It is alleged that the vendors' agents marketed and sold the Payment Protection benefits to customers who were already unemployed or disabled and therefore would not be eligible to receive benefits under the Payment Protection Plan. Plaintiffs also allege that some customers were led to believe that they were enrolling in a free product, rather than purchasing a product that carried a fee. Additionally, plaintiffs allege that some vendors enrolled customers in these add-on products without the consumers' consent. Customers were then billed for the products and had difficulty cancelling them. Finally, plaintiffs allege that customers were sometimes enrolled in the Credit Monitoring products before they had provided all of the verification and authorizations needed to complete the enrollment and make them eligible for the full benefits of these products. Until the customers provided this information, they were billed for, but did not receive, the full benefit of these Credit Monitoring products.

Plaintiffs also allege that the OCC and CFPB consent orders were not Capital One's first warnings about problems associated with the Bank's marketing of the add-on products. In 2007, British regulators fined Capital One approximately $340,000, alleging that Capital One had not provided customers with adequate information about its Payment Protection plans. Additionally, in January of 2012, Capital One paid $13.5 million as part of a settlement with the West Virginia Attorney General over state consumer protection law violations. Finally, in June of 2012, the Mississippi Attorney General brought suit against Capital One for enrolling customers in payment protection plans without obtaining the customers' consent, in violation of Mississippi law.

Plaintiffs assert that the alleged violations of federal law occurred on the individual defendants' watch, despite the fact that the directors and officers owed Capital One a fiduciary duty of loyalty to cause the Bank to comply with the laws, rules, and regulations applicable to the Bank's business and affairs. Plaintiffs also allege that had defendants not breached their duty of loyalty, these improper marketing tactics would not have occurred or continued for years. Plaintiffs further allege that as a result of this conduct, defendants caused Capital One to waste valuable corporate assets. Finally, plaintiffs allege that the individual defendants were unjustly enriched at the expense of Capital One when they received, among other things, the payment of salaries, bonuses, stock options, stock rights, and fees while allegedly violating their duties to Capital One. The complaints note that because Capital One has not brought suit against these officers and directors for this alleged breach, plaintiffs have filed this suit derivatively on behalf of Capital One. The complaints also allege that plaintiffs have not made demand of Capital One's board because such a demand would be futile.[6]

---

After plaintiffs filed these suits in state court, defendants removed the cases to federal court, asserting that there is federal subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiffs allegations of a breach of fiduciary duty require them to demonstrate an underlying violation of federal law. Plaintiffs now ask that the cases be remanded, arguing that there is no federal subject matter jurisdiction.

## II.

Pursuant to 28 U.S.C. § 1331, federal district courts have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States. And, it is well-settled that a claim "arises under" federal law if "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 27-28 (1983).

Three Supreme Court cases, read together, teach a three-step analysis for determining whether the right to relief under state law depends on the resolution of a substantial question of federal law for purposes of federal jurisdiction. *See Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2004); *Merrell Dow Pharm. Inc. v. Thompson et al.*, 478 U.S. 804 (1985); *Enterprise Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677 (2006). The test is as follows:

> First, a court must determine whether the asserted state law claim depends on the resolution of a disputed federal law question. *Grable*, 545 U.S. at 314.

---

[6] The parties, in a pending motion to dismiss, dispute whether the required demand has been shown to be futile.

> Second, a court must determine whether the disputed federal law question imbedded in the asserted state claim is substantial. *Id.*
>
> And third, a court must consider whether the exercise of federal jurisdiction in the circumstances would disturb "any congressionally approved balance of federal and state judicial responsibilities." *Id.*

### A.

First, there can be no serious doubt that plaintiffs' state law claims depend on the resolution of disputed federal questions, namely whether the Bank violated certain federal consumer protection laws. Specifically, plaintiffs allege that defendants breached their fiduciary duty under Delaware law by allowing the Bank to violate various federal, and possibly state,[7] consumer protection statutes, in particular Sections 5 and 6 of the Federal Trade Commission Act, 12 C.F.R. § 37.8, and Sections 1031 and 1036 of the Consumer Financial Protection Act. Plaintiffs therefore must demonstrate a violation of federal law in order to prevail on their state law claims.[8]

Plaintiffs essentially concede that federal questions underlie their state law claims, but go on to argue that the federal questions, by virtue of the consent orders, are neither unresolved nor

---

[7] It may be argued that the complaints, read expansively and charitably, also allege that defendants breached their state law duties by allowing Capital One to violate West Virginia's and Mississippi's consumer protection laws. Resolution of those state claims plainly involves no need to address or decide any federal questions, and thus, these claims, if indeed they are alleged, are appropriately remanded to state court. *See In re Capital One Derivative Shareholder Litig.*, 1:12cv1100 (E.D. Va. Nov. 30, 2012) (Order).

[8] Neither reached nor decided here is the question of precisely what plaintiffs must prove to establish their state law claims. In other words, the analysis here has proceeded on the assumption—not seriously disputed—that federal law violations are the basis of plaintiffs' Delaware state law claims. Yet, not addressed here is the question whether under Delaware law plaintiffs must prove that defendants participated in, approved of, or negligently allowed federal violations to occur by failing to supervise the call centers properly. These issues may be addressed in deciding plaintiffs' motions to dismiss.

disputed. This argument misreads the consent orders. Neither consent order, carefully read, includes binding admissions by the signatories as to whether these violations occurred. To the contrary, both consent orders explicitly preclude such a reading. Thus, the CFPB consent order states that the Bank consents to the agreement, but does so "without admitting or denying the findings of fact or conclusions of law herein" and that the consent order "will not constitute or be construed as an admission or denial by the Bank as to any fact, finding, conclusion, issue of law, or violation of law." CFPB Consent Order at 2, 26-27. Similarly, the OCC consent order states that the Bank consents to the order "without admitting or denying any wrongdoing" and "neither admits nor denies" the OCC's finings. OCC Consent Order at 2 and Stipulation at 2. In short, because the Bank explicitly did not admit any agency findings or wrongdoing listed in the consent orders, plaintiffs misread these consent orders in claiming the contrary.

Nor can plaintiffs rely on any collateral estoppel or issue preclusive effects of the consent orders, as neither consent order warrants such effect. The consent orders are essentially settlement agreements, and as the Supreme Court has noted, "settlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear…that the parties intend their agreement to have such an effect." *Arizona v. California*, 530 U.S. 392, 414, *supplemented*, 531 U.S. 1 (2000). Here, it is pellucidly clear that the parties did not intend such an effect. Moreover, the issue preclusion on which plaintiffs rely does not apply where, as here, the defendants are different from the parties to the consent order, and where, as here, the issues of fact and law related to the federal violations were not "actually litigated and resolved in a valid court determination essential to the prior judgment." *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001). In sum, issue preclusion or collateral estoppel is not available to plaintiffs because the questions of federal law were not actually litigated and decided in the process of

negotiating and entering into the consent orders and because the defendant officers and directors were not parties to the consent orders.[9] *See Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) (stating that "[a] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit" ); *See also Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006) (stating that a "full and fair opportunity to litigate the issue in the previous forum" is a requirement for issue preclusion). Accordingly, there is no sound basis for plaintiffs' assertion that the federal questions underlying their state law claims are already resolved or undisputed; they are not.

### B.

The second step in the Supreme Court's mandated analysis is to assess whether the federal questions presented are substantial. In this regard, it appears from the case law that there are two senses in which the word substantial may be used. First, a federal question may be substantial based on the role it plays in the complaint. *See Grable*, 545 U.S. at 315 (finding that "[w]hether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case"). Second, a federal question may be substantial based on its importance to the federal system. *Id.* (holding that the Federal "Government has a strong interest in the prompt and certain collection of delinquent taxes" and

---

[9] Six of the thirteen individual defendants, Mr. Dietz, Mr. Fairbank, Ms. Hackett, Mr. Hay, Mr. Perlin, and Mr. Schneider, signed the OCC consent order in their capacity as directors of the Bank. Mr. Fairbank and Mr. Schneider were the only signers of the CFPB consent order. Mr. Fairbank signed as the Chairman of the Bank and on behalf of the Board of Directors of the Bank. Mr. Schneider signed in his capacity as the President of the Bank. The seven other named defendants did not sign either of the consent orders.

that "[t]he Government thus has a direct interest in the availability of a federal forum to vindicate its own administrative action"). The federal questions presented here are substantial in both senses.

There can be no doubt that the federal questions underlying plaintiffs' Delaware state law claims—violations of the Federal Trade Commission Act and the Consumer Financial Protection Act—are substantial in the sense that these issues play a central role in the resolution of the plaintiffs' state law claims. Indeed, plaintiffs in their briefs, refer to the federal claims as the "heart" of their case. Pls' Mem. in Support of Mot. to Remand, at 13. Defendants, for their part, correctly note that "[p]laintiffs' claims stand or fall on federal law." Defs' Opp. to Pls' Mot. for Remand for Lack of Subject Matter Juris., at 9. Thus, the federal questions presented here plainly are substantial, just as they were in *Grable*, where the Supreme Court found that the issue of whether Grable received adequate notice under federal law was substantial in part because it was dispositive of the case. *Grable*, 545 U.S. at 315; *see also Empire Healthchoice*, 547 U.S. at 700 (describing the holding in *Grable*). The questions of federal law may be dispositive here, as a finding that no federal violations occurred would end the matter. And while a finding that federal laws were violated would not assure a plaintiffs' victory, plaintiffs certainly cannot prevail in the absence of such a finding. In sum, there is no doubt that the federal questions are substantial in terms of the role they play in this case.

Nor is there any doubt that the federal questions underlying plaintiffs' state law claims are important to the federal system. The question whether consent orders carry an issue preclusive effect is critical to the ability of federal agencies to negotiate with and persuade companies to sign consent orders. A conclusion that consent orders that explicitly disclaimed admissions of liability nonetheless operated via collateral estoppel to establish liability in

subsequent cases would undoubtedly limit substantially the usefulness of such orders in resolving regulatory matters. The federal questions presented here are also important to the federal system because they likely will require determinations of whether the alleged federal consumer protection laws have been violated. The Bank is chartered under the National Bank Act and is thus subject to an extensive federal regulatory scheme that will be affected by the interpretation of the statutes at issue. Additionally, the Consumer Financial Protection Act, which took effect in 2010, is relatively new. Federal review will help to ensure that these new provisions of law are treated with uniformity as they are initially interpreted. This case is particularly similar to *VA Timberline* where the court held that "those affected by FERC[10] licenses may find it valuable to come before judges used to federal regulatory matters." *VA Timberline, LLC v. Appalachian Power Co.*, No. Civ.A. 4:06-CV-00026, 2006 WL 1993557 at *2 (W.D. Va. July 13, 2006). The same is true here. Federal courts have more experience with federal regulatory matters, and the CFPB has a strong interest in the consistent interpretation of the new Consumer Financial Protection Act.

The conclusion that the federal law violations underlying plaintiffs' Delaware state law claims are substantial also finds firm support in the decisions of other courts.[11] Therefore, the

---

[10] Federal Energy Regulatory Commission ("FERC").

[11] *See, e.g., VA Timberline*, at *2 (finding a substantial federal question where plaintiffs sought a declaratory judgment on their rights pursuant to an easement that was subject to the terms and conditions of a license issued by the Federal Energy Regulatory Commission); *Rose v. SLM Financial Corp.*, No. 3:05-CV-445, 2007 WL 674319 at *4 (W.D.N.C. Feb. 28, 2007) (Mag. Judge) (in a state law breach of contract suit, the issue of whether mandatory disclosures made under the Truth in Lending Act or the Real Estate Settlement Procedures Act could form the basis of a contract was a substantial federal question); *Prince v. Berg*, No. C 10-4233, 2011 WL 9103 at *2 (N.D. Cal. Jan. 3, 2011) (finding a substantial federal question in a shareholder derivative action based on a failure to prevent overbilling under the False Claims Act); *Weil v. Killough*, No. 2:12-cv-00856, 2012 WL 3260395 at *4 (D.S.C. Aug. 8, 2012) (a legal malpractice claim that required proof of patent infringement presented a substantial federal

federal questions underlying plaintiffs' state law claims are plainly of substantial importance to the federal system.

C.

The third step of the analysis requires a careful assessment of whether exercising federal jurisdiction in this case will disturb the sensitive balance of responsibilities between state and federal courts. As the Supreme Court said in *Grable*,

> even when the state action discloses a contested and substantial federal question, the exercise of federal jurisdiction is subject to a possible veto. For the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331.

*Grable*, 545 at 313-14.

Plaintiffs argue that a finding of federal jurisdiction in this case would upset Congress's intended division of labor between state and federal courts because it would open the floodgates and allow into federal court a swell of cases involving state law breach of fiduciary duty claims premised on violations of federal laws, including federal securities laws, the Foreign Corrupt Practices Act, and the False Claims Act. This argument fails to persuade. To begin with, the result reached here extends only to shareholder derivative actions that depend on the resolution of a substantial, disputed question of federal law, a class of cases to which the door to federal court has long been open. This case neither opens the door wider, nor does it open a new door to federal court. Thus, the result reached here does not alter the existing balance of state and

---

question, allowing federal jurisdiction under 28 U.S.C. § 1338(a)); *County of Santa Clara v. Astra USA, Inc.*, 401 F.Supp.2d 1022, 1028 (finding construction of a federal statute to be a substantial federal question because the construction "could determine both liability and damages" in the case).

federal court jurisdiction, and there is nothing to suggest that a finding of federal jurisdiction here runs counter to congressional intent.

Plaintiffs argue that federal jurisdiction should not be found here because the federal statutes on which the consent orders are based do not provide for a private cause of action. Although it is true that there are no private causes of action available under the Federal Trade Commission Act[12] or the Consumer Financial Protection Act[13], it does not follow that federal jurisdiction is absent in this case. The Supreme Court made unmistakably clear in *Grable* that while the existence of a federal private cause of action may weigh in favor of a finding of federal jurisdiction, it is not necessary for that purpose. *Grable*, 545 U.S. at 317 (holding that *Merrell Dow* cannot be read as "converting a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one"). Thus, the absence of a federal private right of action is a factor to consider in this calculus, but it is not dispositive; and here, the absence of such a cause of action is not sufficient to overcome the other factors weighing in favor of federal jurisdiction.

Plaintiffs' argument that Virginia state courts are better positioned to determine plaintiffs' state law claims misses the mark by a wide margin. Delaware law, not Virginia law, will provide the substantive elements of the claims for breach of fiduciary duty, unjust enrichment, and corporate waste. Thus, there is no basis for suggesting that a Virginia state court is in a better position than a federal court to consider and decide questions of Delaware law.

---

[12] *See Summey v. Ford Motor Credit Co.*, 449 F. Supp. 132, 135 (D.S.C. 1976) *aff'd*, 573 F.2d 1306 (4th Cir. 1978) (holding that is well settled that there is no private, federal right of action for violations of the Federal Trade Commission Act).

[13] Consumer Financial Protection Act, 12 U.S.C. § 5481 *et. seq.*

14

## III.

It is important to note that the result reached here is consistent and in harmony with the three Supreme Court cases that provide the analytical framework for deciding this case. Thus, this case is analogous to *Grable*, which upheld federal jurisdiction where, as here, it was necessary to resolve a potentially dispositive question of federal law important to the federal system in order to decide the state law claim. Further, this case is unlike *Empire Healthchoice* where the "claim was triggered, not by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court." *Empire Healthchoice*, 547 U.S. 700. Here, the consent orders issued by federal agencies have prompted this suit, and the state law claims depend on whether violations of federal law can be shown. And finally, this case is also unlike *Merrell Dow* where, as is not true here, a finding of federal jurisdiction would have allowed any state cause of action that incorporated a federal standard to come into federal court, thereby significantly altering Congress's intended allocation of responsibilities between state and federal courts. *Merrell Dow*, 478 U.S. at 814.

In summary, it is clear that plaintiffs' state causes of action rest and depend upon substantial and disputed questions of federal law that must be resolved in deciding this case. It is also clear that exercising federal jurisdiction in this case will not open the doors of federal courts to a class of cases heretofore closed to federal courts. Nor will it upset Congress's intended balance of responsibilities between state and federal courts.

Accordingly, the motion to remand this matter to state court must be denied. An appropriate order has issued.

Alexandria, Virginia
December 21, 2012

/s/
T. S. Ellis, III
United States District Judge