IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**



IN RE CAPITAL ONE DERIVATIVE    )      **Lead Case No. 1:12cv1100**
SHAREHOLDER LITIGATION         )
                                  )

## MEMORANDUM OPINION

In this removed shareholder derivative action, two shareholders of Capital One Financial Corporation ("Capital One") have brought suit against Capital One's directors and officers, alleging that the directors and officers (i) breached their fiduciary duty of loyalty, (ii) committed corporate waste, and (iii) were unjustly enriched when they failed to prevent allegedly deceptive sales practices at Capital One's third-party call centers. In their motions to dismiss, defendants argue that plaintiffs' claims fail because (1) plaintiffs have failed to meet the heightened pleading requirements of Rule 9(b), Fed. R. Civ. P.; (2) plaintiffs have failed to meet even the more basic requirements of Rule 8, Fed. R. Civ. P.; (3) plaintiffs have failed to state a claim upon which relief can be granted in accordance with Rule 12(b)(6), Fed. R. Civ. P.; (4) plaintiffs have failed to plead with particularity, as required by Rule 23.1, Fed. R. Civ. P., that making demand of the board of directors would be futile; (5) plaintiffs have failed to allege continuous ownership of Capital One stock; and (6) plaintiffs have failed to verify the complaint. For the reasons that follow, defendants' motions must be granted in part and denied in part.

Plaintiffs Iron Workers Mid-South Pension Fund and Kim Barovic filed separate complaints in the Circuit Court of Fairfax County, Virginia. These complaints are essentially identical, naming the same defendants, and alleging essentially the same facts and precisely the same causes of action. Both cases were removed based on federal question jurisdiction to this district where they have been consolidated. *In re Capital One Derivative Shareholder Litig.*, 1:12cv1100 (E.D. Va. Nov. 30, 2012) (Order). Both plaintiffs held shares of Capital One stock at the time of the alleged wrongdoing, and both continue to hold Capital One shares.[2]

The nominal defendant, Capital One Financial Corporation ("Capital One"), is a publicly-traded Delaware corporation headquartered in McLean, Virginia. Capital One is the parent company of Capital One Bank (USA) (the "Bank"), which is one of the country's largest consumer credit and debit card issuers. It should be noted that the complaints identify Capital One and the Bank as separate entities, but then do not distinguish between Capital One and the Bank in discussing the Consent Orders or the liability of the officers and directors. The suit is brought against the directors and officers of Capital One, but the Bank is the entity named in the Consent Orders and the entity alleged to have been harmed. Where, as here, stockholders sue the parent company of the allegedly harmed subsidiary, Delaware law recognizes and defines such a claim as a double derivative suit. *See Sternberg v. O'Neil*, 550 A.2d 1105, 1107 n. 1 (Del. 1988) (defining a double derivative action as "a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary company"). The Bank also

---

[1] The facts recited here are derived from plaintiffs' complaints and from the parties' briefs addressing the motions to dismiss.

[2] Defendants argue that plaintiffs have failed to plead adequately that they held Capital One shares at the time the alleged wrongdoing occurred. That issue is addressed *infra*.

markets and sells credit card "add-on" products, such as Payment Protection and Credit Monitoring.

Plaintiffs named thirteen individual defendants, all of whom are either directors, officers, or both, of Capital One. Only defendant Richard D. Fairbank is both a director and an officer. He has been a director of Capital One since 1994 and is also Capital One's Chief Executive Officer and President. In addition to Fairbank, the complaints name as defendants seven other current Capital One directors: W. Roland Dietz, Patrick W. Gross, Ann Fritz Hackett, Lewis Hay, III, Pierre E. Leroy, Mayo A. Shattuck, III, and Bradford H. Warner. The complaints also name as a defendant a former director, Edward R. Campbell, a director of Capital One from 2005 until May of 2012. These named directors also serve on various board committees.

In addition to naming the directors listed above as defendants, the complaints also name as defendants the following Capital One officers: Peter A. Schnall, the Chief Risk Officer since 2006, and prior to that the Chief Credit Officer; Ryan M. Schneider, the President of Capital One's Card division since 2007, and an Executive Vice President prior to that time; Sanjiv Yajnik, the President of Financial Services since 2009, and an employee of Capital One's European and Canadian credit card businesses from 1998 until 2009; and Gary L. Perlin, the Chief Financial Officer since 2003.

Plaintiffs allege that these directors and officers breached their fiduciary duty of loyalty to Capital One, engaged in corporate waste, and were unjustly enriched because they allowed the Bank to engage in various deceptive and illegal practices related to two of its "add-on" products, thereby violating federal consumer protection laws. The fiduciary duty, corporate waste, and unjust enrichment claims are all Delaware state law claims. The implicated "add-on" products are known as "Payment Protection" and "Credit Monitoring". Payment Protection allows a

3

customer to cancel up to twelve months of minimum payments on the customer's credit card if the customer becomes unemployed or temporarily disabled. Credit Monitoring provides a package of consumer services including identity theft protection, daily credit monitoring, and notification of suspicious credit transactions.

The complaints allege that the Bank entered into two Consent Orders that are at the heart of plaintiffs' claims. First, the Bank entered into a Consent Order with the Office of the Comptroller of the Currency (the OCC Consent Order), in which the OCC found that by reason of certain marketing, sales, and retention practices, the Bank engaged in "unfair and deceptive practices" under Sections 5 and 6 of the Federal Trade Commission Act[3] and that "by failing to maintain effective risk management and control processes," the Bank violated 12 C.F.R. § 37.8. Compl., at ¶ 38 (quoting OCC Consent Order, at 6-7). Second, the Bank entered into a Consent Order with the Consumer Financial Protection Bureau (the CFPB Consent Order), which found that the Bank violated Sections 1031 and 1036 of the Consumer Financial Protection Act[4] in connection with the marketing, sales, and operations of the Bank's Payment Protection and Credit Monitoring products.

As part of the OCC and CFPB Consent Orders, the Bank was required (i) to pay approximately $210 million in damages and fines, and (ii) to implement better control procedures designed to prevent such problems in the future. Specifically, the Bank had to refund approximately $143 million to nearly two million customers impacted by the Payment Protection and Credit Monitoring sales and retention practices, as well as $7 million to customers impacted

_____

[3] 15 U.S.C. § 45(a)(1).

[4] 12 U.S.C. § 5536.

4

by the Bank's billing practices for the Credit Monitoring products. The Bank was also required to pay $25 million in civil penalties to the CFPB and $35 million in civil penalties to the OCC.

Plaintiffs allege, based on the OCC and CFPB Consent Orders, that between 2010 and early 2012, when customers with low credit scores or low credit limits called to activate newly-issued or reissued credit cards, those customers were routed to third party vendors' call centers.[5] Customers were also routed to these third-party vendors' call centers when they called to cancel their enrollment in the Payment Protection and Credit Monitoring programs. Third party vendors' employees at the call centers marketed and sold the Payment Protection and Credit Monitoring products during the card activation telephone calls and endeavored to retain the customers in these add-on programs during the cancellation phone calls. Plaintiffs allege, based on the Agencies' findings, that the vendors used "high-pressure sales [and retention] tactics and made materially false, deceptive, or otherwise misleading oral statements relating to the costs, coverage terms, benefits, and other features of the Payment Protection and Intersections Credit Monitoring products" during these telephone calls. Compl. at ¶ 36 (quoting the OCCs' Consent Order, at 4-5).

Citing the CFPB Consent Order, plaintiffs allege that the Bank's customers were misled by the call centers about the benefits of enrolling in these add-on products, including being told by call center personnel that purchasing the products would improve their credit scores and help them increase their limits on their Capital One credit cards. Plaintiffs allege that customers were not always told that purchasing the products was optional and that some customers were told they had to purchase the products in order to receive full information on the products. It is

---

[5] The record does not reflect, nor, surprisingly, did Capital One's counsel know, either the location of the allegedly offending call centers or the nature of the legal relationship between the call centers and the Bank.

alleged that the vendors' agents marketed and sold the Payment Protection benefits to customers who were already unemployed or disabled and therefore would not be eligible to receive benefits under the Payment Protection Plan. Plaintiffs also allege that some customers were led to believe they were enrolling in a free product, rather than purchasing a product that carried a fee. Additionally, plaintiffs allege that some vendors enrolled customers in these add-on products without the consumers' consent. Customers were billed for the products and then had difficulty cancelling the products when they learned of the fee. Finally, plaintiffs allege that between 2002 and 2011 customers were sometimes enrolled in the Credit Monitoring products before they had provided all of the verification and authorizations needed to complete the enrollment and make them eligible for the full benefits of these products. Until the customers provided this information, they were billed for, but did not receive, the full benefit of these Credit Monitoring products.

Plaintiffs also allege in their complaints that the OCC and CFPB Consent Orders were not Capital One's first warnings about problems associated with the Bank's marketing of the add-on products. In 2007, British regulators fined Capital One Bank (Europe) Plc. approximately $340,000, alleging that Capital One had not provided customers with adequate information about its Payment Protection plans. Additionally, in January of 2012, Capital One paid $13.5 million as part of a settlement with the West Virginia Attorney General over state consumer protection law violations. Finally, in June of 2012, the Mississippi Attorney General brought suit against Capital One for enrolling customers in payment protection plans without obtaining the customers' consent, in violation of Mississippi law. Plaintiffs also allege in their response to defendants' motions to dismiss—though not in the complaints themselves—that the

directors and officers should have been alerted to the alleged wrongful acts at the call centers by five other incidents as well.[6]

Plaintiffs in both complaints assert that the alleged violations of federal law occurred on the individual defendants' watch, *i.e.*, during the individual defendants' tenure as officers or directors, and that this occurred despite the fact that the directors and officers owed Capital One a fiduciary duty of loyalty to cause the Bank to comply with the laws, rules, and regulations applicable to the Bank's business and affairs. Plaintiffs also allege that had defendants not breached their duty of loyalty, these improper marketing tactics would not have occurred. Plaintiffs further allege that as a result of this conduct, defendants caused the Bank to waste valuable corporate assets. Finally, plaintiffs allege that the individual defendants were unjustly enriched at the expense of Capital One when they received, among other things, the payment of salaries, bonuses, stock options, stock rights, and fees while allegedly violating their duties to Capital One. The complaints note that because Capital One has not brought suit against these officers and directors for this alleged breach, plaintiffs have filed this suit derivatively on behalf of Capital One. The complaints also allege that plaintiffs have not made demand of Capital One's board because such a demand would be futile.

Defendants assert that plaintiffs' complaints fail to state a claim under with Rule 9(b)'s or Rule 8's pleading requirements; that plaintiffs have failed to state a claim upon which relief can be granted, requiring dismissal under Rule 12(b)(6); and that plaintiffs have failed to plead with particularity an acceptable reason for failing to make demand of the directors, as required by Rule 23.1. Defendants therefore claim that plaintiffs' complaints should be dismissed.

---

[6] See *infra,* Section IV.

## II.

Analysis properly begins with defendants' argument that the complaints do not meet

Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements for fraud claims.[7] This

is an appropriate place to begin the analysis because plaintiffs concede the complaints do not

meet Rule 9(b)'s requirements for pleading a fraud claim, contending instead that Rule 9(b) does

not apply to the complaints. Thus, if Rule 9(b)'s requirements apply, the complaints fail.

Defendants argue that plaintiffs must meet Rule 9(b)'s pleading requirements because

plaintiffs' complaints allege that the Bank "misled," "deceived," and "misinformed" customers

about the add-on products, and the complaints therefore "sound in fraud" and are within the

purview of Rule 9(b). Defendants correctly assert that the cause of action alleged need not be

fraud in order to trigger Rule 9(b)'s requirements. In support, defendants rely on *Cozzarelli v.*

*Inspire Pharms. Inc.*, where the Fourth Circuit held, in agreement with most circuits,[8] that Rule

9(b)'s requirements apply to allegations under the Securities Act that "sound in fraud." 549 F.3d

at 629. In *Cozzarelli*, the plaintiffs had alleged that the defendants violated Sections 11 and

12(a)(2) of the Securities Act by issuing false registration statements and prospectuses. Sections

11 and 12(a)(2) both prohibit making false or materially misleading statements in prospectuses

and registration statements, although scienter is not a required element, as it would be in a typical

---

[7] Rule 9(b), Fed. R. Civ. P., provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

[8] *Cozzarelli v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) (citing *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 68 (1st Cir.2008) (collecting cases); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277–78 (11th Cir.2006) (collecting additional cases). *But see In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314–15, 318–19 (8th Cir.1997) (holding that Rule 9(b) did not apply to claims brought under Sections 11 and 12(2) of the Securities Act because proof of fraud and scienter were not necessary for recovery).

fraud claim. *Id.* at 628. Even so, the Fourth Circuit concluded that these claims "sound[ed] in fraud" and were therefore required to meet Rule 9(b)'s pleading requirements. *Id.* at 629.

Although *Cozzarelli* specifically involved causes of action brought for violations of the Securities Act, defendants correctly observe that other courts have held that Rule 9(b)'s requirements apply to causes of action outside the Securities Act. *See, e.g., F.T.C. v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 852-53 (C.D. Cal. 2010) (a claim under the Federal Trade Commission Act sounded in fraud where the claim alleged "a unified course of fraudulent conducted and relie[d] entirely on that course of conducts as the basis of [the] claim"); *Myers v. Lee*, 1:10CV131, 2010 WL 2757115 (E.D. Va. July 12, 2010) (finding that Rule 9(b) applies to claims under the Virginia consumer protection laws).

In asserting that Rule 9(b) applies to the complaints here in issue, defendants have overlooked a key distinction between this case and the cases on which defendants rely. In all of those cases, the defendants were alleged to have engaged in, or overseen, some sort of fraudulent conduct.[9] Not so here; this case is significantly different. In this case, plaintiffs do not allege that the defendant directors and officers engaged in fraud; rather, they allege that the defendant directors and officers failed to supervise properly the third-party call centers and prevent call center employees from engaging in deceptive, fraudulent, or misleading behavior. Significantly, plaintiffs do not allege that the defendant directors and officers themselves made false statements or even that they knew that the independent call centers' employees were making false

---

[9] *See Cozzarelli*, 549 F.3d at 628-29 (alleging that the defendant company and its CEO issued prospectuses that contained false or misleading statements); *F.T.C. v. Lights of Am., Inc.*, 760 F. Supp. 2d at 852-53 (noting that one element of the FTC claim brought in the case was that "the individual participated directly in the acts or had the authority to control them"); *Myers v. Lee*, 2010 WL 2757115 (finding that Rule 9(b) applied to Virginia protection laws but noting that "a defendant can only be liable for a Virginia Consumer Protection Act violation if he or she actually engaged in the conduct that constitutes fraud").

9

statements about the payment protection plans. Put simply, plaintiffs accuse defendants of failing to supervise, not of committing fraud. Because this is not a case in which defendants are alleged to have engaged in fraud, the pleading requirements for allegations of fraud found in Rule 9(b) are not triggered.[10]

## III.

Although Rule 9(b)'s pleading standards do not apply, plaintiffs are required to meet other pleading standards. Most fundamentally, plaintiffs must plead a claim upon which relief can be granted, or their claims will be dismissed in accordance with Rule 12(b)(6), Fed. R. Civ. P. Plaintiffs must also meet the pleading requirements of Rule 8, as elucidated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), as well as the pleading requirements found in Rule 23.1, Fed. R. Civ. P.

Under Rule 8 and *Iqbal/Twombly*, plaintiffs' complaints must "plead sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct," and the facts must be sufficient "to nudge claims across the line from conceivable to plausible." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255-56 (4th Cir. 2009) (citing *Ashcroft v.* Iqbal, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Additionally, because this is a shareholder derivative action, Rule 23.1's pleading standards apply. Rule 23.1 provides enhanced pleading requirements where shareholders bring a derivative action to enforce the corporation's rights when the corporation has not done so.

---

[10] As noted *infra*, however, Rule 9(b)'s state of mind pleading requirements are applicable with respect to the allegations of bad faith.

Specifically, Rule 23.1(b) requires that the shareholders either plead with particularity that they have demanded that the board file a suit asserting the corporation's rights or plead with particularity the reasons that they have not made this demand of the board of directors. Shareholders are excused from making demand of the board of directors when they plead with particularity that doing so would be futile. *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). But case law makes clear that futility is not easy to demonstrate. In particular, plaintiffs must plead "particularized facts" establishing a reasonable doubt that "the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). To plead particularized facts establishing a reasonable doubt that the directors could act independently, plaintiffs must demonstrate not just that the directors face some risk of liability, but that their actions were so egregious that "*a substantial likelihood of director liability*" exists. *Aronson v. Lewis*, 473 A.2d 815 (Del. 1984) (emphasis added) (overruled on other grounds in *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). Because the requirements of both Rule 8 and Rule 23.1 must be met, they are addressed separately.

## IV.

First, plaintiffs must state a claim upon which relief can be granted and "plead sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255-56 (4th Cir. 2009).

### A.

Plaintiffs claim that defendants have committed corporate waste and are liable for the monies paid by the Bank to resolve the OCC and CFPB investigations. Under Delaware law,

11

"[t]he essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes." *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). Thus, plaintiffs must allege and prove that "the consideration received by the corporation was so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation paid." *Taylor v. Kissner*, CA 11-635-RGA, 2012 WL 4461528, at *9 (D. Del. Sept. 27, 2012). Delaware courts acknowledge that claims of corporate waste are not easily proved, as such claims are "confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Id.* at *9 (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)). Additionally, the Delaware Supreme Court has held that "[m]ost often the claim [for corporate waste] is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration was received." *Brehm*, 746 A.2d at 263. On the other hand, where any substantial consideration is received and there is a good faith judgment that the transaction is worthwhile, the transaction will not constitute corporate waste. *Id.*

Given these Delaware law principles, it is clear that plaintiffs' claim for corporate waste fails to state a claim. Although the Bank paid substantial sums to the OCC and the CFPB, it did so to resolve these regulators' investigations. This is not a "transfer of assets with no corporate purpose," *Id.* To the contrary, the purpose of paying the fines was to resolve the OCC and CFPB investigations. The consideration received in return for the payment of the fines was a final resolution to the OCC and CFPB investigations. Additionally, there is nothing to suggest that the amount paid to resolve the investigations was in any way disproportionate to the Bank's liability or to the value to the Bank in resolving the OCC's and CFPB's investigations without litigation. *See Boeing Co. v. Shrontz*, Civ. A. No. 11273, 1992 WL 81228, at *234-35 (Del. Ch. April 20, 1992) (noting that "in order to state a claim for waste, the complaint must allege facts

12

from which one could infer that 'what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid.'") (quoting *Saxe v. Brady*, 184 A.2d 602, 610 (Del. Ch. 1962)). Additionally, plaintiffs have neither pled nor forecasted any facts to indicate defendants failed to act in good faith when they entered into the Consent Orders. Entering into a settlement hardly seems "unconscionable" or an "irrational[] squander[ing]" of corporate assets. *Brehm v. Eisner*, 746 A.2d at 263. Because plaintiffs have failed to plead a claim for corporate waste on which relief can be granted and have failed to forecast any facts that could support such a claim, defendants' motion to dismiss the claim for corporate waste must be granted.

## B.

Next, plaintiffs claim that defendants have been unjustly enriched because they were paid to fulfill certain duties, but allegedly failed to do so when they allowed the Bank to violate the law. Specifically, plaintiffs allege that the unjust enrichment includes, "among other things, the payment of salary, bonuses, stock options, stock rights, fees, and other payments." Compl. at ¶ 60.

The Delaware Supreme Court has defined unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999). Under Delaware law, "[t]he elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999).

13

No one disputes that the directors and officers were paid for their services to Capital One. Yet, even assuming, as alleged, that wrongdoing occurred at the call centers, this is not sufficient to state a claim for unjust enrichment against the officers and directors, and thus this claim must be dismissed under Rule 12(b)(6). Plaintiffs' complaints contain no allegations of "a relationship between the enrichment [of defendants] and impoverishment [of the Bank]." *Jackson Nat. Life Ins.*, 741 A.2d at 393. Specifically, no facts are pled that indicate that there is a relationship between defendants' compensation on the one hand, and the settlements with the agencies or the alleged wrongdoing at the call centers on the other. Plaintiffs have also failed to allege facts that raise a plausible inference that there was no justification for defendants' compensation. Further, plaintiffs have failed to forecast any facts that would support a valid claim of unjust enrichment under Delaware law. Therefore, defendants' motion to dismiss the claim for unjust enrichment under Rule 12(b)(6) must be granted.

## C.

Finally, plaintiffs claim that the defendant directors and officers breached their fiduciary duty of loyalty by failing to prevent the third-party call centers from engaging in the allegedly wrongful conduct. There are two basic fiduciary duties under Delaware law, the duty of care and the duty of loyalty. Capital One's Restated Certificate of Incorporation provides that its directors may be held liable only for breaches of the duty of loyalty or "acts or omission not in good faith or which involve intentional misconduct or a knowing violation of law." Restated Certificate of Incorporation, Capital One Financial Corporation, Article X (May 16, 2011). Such limitations are permissible and effective under Delaware law. *See* 8 Del. C. § 102(b)(7).[11]

---

[11] 8 Del. C. § 102(b)(7) provides that corporations' certificates of incorporation may contain provisions "eliminating or limiting the personal liability of a director to the corporation or its

Most breaches of the duty of loyalty involve a conflict of interest between one or more of the directors or officers and the company or shareholders as a whole. As the Delaware Supreme Court has noted, "[e]ssentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) *decision modified on reargument*, 636 A.2d 956 (Del. 1994). No such conflict is alleged in this case. However, the duty of loyalty incorporates as a "subsidiary element" a requirement that a corporation's officers and directors act in good faith. *Stone v. Ritter*, 911 A.2d 362, 369-70 (2006). As a result, "the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith." *Id.* at 70. Importantly, this is a difficult standard to meet because "an extreme set of facts is required to sustain a disloyalty claim" premised on the notion that directors were disregarding their duties. *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

Plaintiffs argue that defendants breached their duty of loyalty to the corporation by "fail[ing] to ensure that Capital One's business and operations complied with consumer protection laws." Compl. at ¶ 54. The Delaware Court of Chancery has held that "by consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused". *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007). Similarly, the Court of Chancery has more recently held that

---

stockholders ...provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit."

15

a director of a Delaware corporation violates the duty of loyalty when he "knowingly causes [the company] to seek profit by violating the law." *In re Massey Energy Co.*, CIV.A. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011). According to these cases, to violate the duty of loyalty, a violation of the law must be knowing, conscious, or in bad faith. This requirement is consistent with the Certificate of Incorporation's allowance of liability for breaches of the duty of loyalty and actions undertaken in bad faith. Therefore, to prove that the directors or officers have breached their duty of loyalty to the corporation, plaintiffs must allege and show (i) that the Bank broke the law, and (ii) that defendants knowingly, consciously, or in bad faith allowed the Bank to break the law.

Plaintiffs contend that the Bank broke the law when third-party call center employees made certain misrepresentations to customers and that defendants failed to prevent these misrepresentations. Importantly, plaintiffs have not alleged that the defendant directors and officers were personally involved in any misrepresentations made to customers regarding the add-on products; instead, plaintiffs allege only (i) that misrepresentations occurred when the third-party call centers' employees spoke with customers; (ii) that these "violations [at the call centers] occurred on Individual Defendants' watch" (Compl. at ¶ 7); (iii) that "[b]y failing to oversee Capital One's credit card 'add-on' product sales practices, Defendants damaged the Company" (Compl. at ¶ 7); and (iv) that "while under [the individual defendants'] stewardship, Capital One engaged in" the alleged misconduct (Compl. at ¶ 25). As defendants correctly point out, "[p]laintiffs make no attempt to attribute *any* specific conduct, inaction, notice, or knowledge to *any* particular individual defendant." Mem. In Support of Mot. to Dismiss at 5.

Plaintiffs advance two alternative theories of their case. First, plaintiffs allege that the defendant board members and officers failed to implement appropriate controls and failed to

16

monitor the call centers properly and were therefore completely unaware of the allegedly improper behavior at the call centers. Alternatively, plaintiffs allege that defendants were aware of "red flags" that should have alerted defendants to problems at the call centers, but consciously decided not to heed the red flags, investigate, and correct the call centers' practices.

First, there is the allegation that defendants, without knowledge of the alleged wrongdoing at the call centers, failed to implement controls that would have prevented or detected the false and misleading statements allegedly made to customers. This type of claim is known in Delaware law as a *Caremark* claim, named for the case *In re Caremark International Inc. Derivative Litigation*, 689 A.2d 959 (Del. Ch. 1996). It is often stated that a *Caremark* claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Stone v. Ritter*, 911 A.2d 362 (Del. 2006). *Caremark* claims are difficult to prove because plaintiffs must demonstrate a "sustained or systematic failure of the board to exercise oversight." *Stone*, 911 A.2d at 369-70 (quoting *Caremark*, 698 A.2d at 971). To state a *Caremark* claim, plaintiffs must plead that "the directors utterly failed to implement any reporting or information system or controls" or "having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Id.* at 370. In fact, the lack of oversight must be so severe as to amount to bad faith, in other words that the directors knew that they were not discharging their fiduciary obligations. *Id.*

Plaintiffs' allegations miss the *Caremark* standard for utterly failing to implement any controls by a wide margin, and plaintiffs have therefore failed to plead a claim for this type of duty of loyalty breach upon which relief can be granted. This is so because plaintiffs have not pled facts, as required, indicating that there was a "sustained or systematic failure of board to

17

exercise oversight" or that the board "utterly failed to implement any reporting or information system or controls." *Stone*, 911 A.2d at 369-70. Nor are there any allegations that Capital One or the Bank failed to implement controls over the call centers; instead the complaints allege only that the controls that were implemented failed to prevent the alleged wrongdoing. Indeed, the CFPB Consent Order indicates that controls were in place at the call centers. According to the CFPB Consent Order, the Bank developed scripts for the call centers' employees to use in selling the products. CFPB Consent Order at 4. And these scripts, it appears, included introductions of each product and provided responses to certain anticipated questions from customers. *Id.* The CFPB Consent Order goes on to state that the call center employees deviated from the scripts' instructions or misinterpreted the scripts in explaining the products, their sale terms, and customer eligibility requirements. *Id.* In other words, by creating and providing scripts to the call centers the Bank clearly made a substantial effort to provide customers with accurate information and avoid any violations. The CFPB Consent Order may even be read to suggest that the alleged violations were caused by the independent, superseding actions of the third-party call center employees who deliberately chose to ignore the Bank's scripts or instructions. Therefore, the facts alleged fall short of stating a valid *Caremark* claim based on a failure to implement any controls, and accordingly, the complaints' breach of the duty of loyalty claims based on a "sustained or systematic failure of the board to exercise oversight", *Caremark*, 698 A.2d at 971, must be dismissed in accordance with Rule 12(b)(6).

As an alternative to the failure to implement controls prong of *Caremark*, plaintiffs have pled that defendants were alerted to the alleged wrongdoing at the call centers by various red flags, but nonetheless consciously failed to heed these red flags and take any action to address the alleged wrongful conduct at the call centers. Specifically, plaintiffs identified three potential

18

red flags in their complaints and an additional five red flags in their briefs. To plead a claim that defendants consciously ignored red flags and are therefore liable for failing to prevent the company from breaking the law, plaintiffs must demonstrate: (1) that the alleged red flags actually constitute red flags, *i.e.*, that they could plausibly have served as warnings about the problems at the third-party call centers that are the subject of the CFPB and OCC consent orders; (2) that defendants were aware of the red flags; and (3) that defendants acted in bad faith in failing to take appropriate action in light of those red flags.[12]

1.

First, there is the issue of what constitutes a red flag under Delaware law. Information may constitute a red flag where there is a "clear warning" that should put defendants on notice, "alerting [them] to potential misconduct at the Company." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009); *Ash v. McCall*, CIV.A. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000). Thus, the alleged red flags must involve or relate to conduct sufficiently similar to the alleged wrongful conduct at the call centers to alert a reasonable director or officer to potential misconduct at the call centers. Red flags that are not sufficiently similar will not suffice. Second, plaintiffs must allege and prove that defendants were aware of the red flags. Under Delaware law, red flags "are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer." *Wood*, 953 A.2d at 143 (quoting *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, No. 19827, at *2 (Del. Ch. June 5, 2003). Third, where, as here, a company's certificate of incorporation exempts

---

[12] *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009) (a red flag must provide a clear warning that puts defendants on notice of clear misconduct at a company); *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) (red flags are only useful where defendants are aware of them); *Wood*, 953 A.2d at 141 (plaintiffs must plead facts indicating that defendants "had actual or constructive knowledge that their conduct was legally improper").

19

defendants from liability except when defendants have acted in bad faith, plaintiffs must demonstrate that defendants acted in bad faith in failing to take action in response to these red flags. *Id.* at 141.

Three of the alleged red flags cannot plausibly serve as red flags under Delaware law because they could not have provided a "clear warning" that should have alerted defendants to potential misconduct at the call centers. *Citigroup*, 964 A.2d at 128. As discussed below, these instances cannot constitute red flags either because of their timing or because they involve conduct that is not sufficiently similar to the alleged misrepresentations at the call centers. *See id.*

First, plaintiffs state in their complaints that a suit filed by the Mississippi Attorney General against Capital One in June of 2012 for allegedly enrolling customers in payment protection plans without customers' consent should have served as a red flag for the directors and officers. The Mississippi Attorney General's suit cannot constitute a red flag because it was filed after all of the conduct alleged in the OCC and CFPB Consent Orders had already occurred. To serve as a warning, a red flag must alert defendants to conduct that is ongoing and that could be stopped using the newly-acquired information. Put simply, this flag was raised too late to serve as a warning to defendants.

Second, plaintiffs allege that defendants should have been alerted by regulatory agencies' public statements that these agencies intended to begin more rigorous enforcement of consumer protection laws related to the sales of credit card add-on products. Yet, the mere fact that the agencies were increasing enforcement in no way suggests or indicates that wrongful conduct was occurring at the call centers. To serve as a red flag, there must be some link between the alleged red flag and an actual problem within the company, and there is no such link between the agency

statements about more vigorous enforcement of the consumer protection laws and the alleged call center misconduct. *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d at 128 (red flags must alert defendants to a problem within the company). Thus, these statements by the agencies cannot constitute red flags.

Third, in February 2010, the Bank entered into a Consent Order with the OCC concerning the Bank's account closing processes from January 1, 2004 through October 31, 2006. The provisions for restitution found in the 2010 Consent Order state that the Bank was penalized for continuing to charge annual membership fees after customers requested that their accounts be closed. This conduct is significantly different from the alleged misconduct at the call centers and therefore cannot serve as a red flag to the call center misconduct. *See Id.*

Accordingly, defendants' motion to dismiss plaintiffs' claims based on these three candidate red flags must be granted.

Although the three candidate red flags discussed above could not have plausibly alerted defendants to wrongdoing at the call centers, plaintiffs cite five additional candidate red flags that might have done so: (1) Capital One Bank (Europe) Plc.'s 2007 settlement with the British Financial Services Authority ("FSA");[13] (2) Capital One's 2012 settlement with the West Virginia Attorney General;[14] (3) the settlement in a series of class actions concerning Capital

---

[13] In 2007, Capital One Bank (Europe) Plc. was fined approximately $343,000 by Britain's Financial Services Authority. The settlement stated that between January 14, 2006 and April 5, 2006, as a result of Capital One's inadequate systems and controls, "the form of disclosure used in scripts for customers who purchased [payment protection insurance] over the telephone did not always ensure adequate disclosure." Financial Services Authority Final Notice, February 15, 2007, at 6. The FSA also alleged that "the Firm's compliance monitoring telephone sales of [payment protection insurance] was not sufficiently effective." *Id.* at 2.

[14] In January of 2012, Capital One entered into a $13.5 million settlement agreement with the Attorney General of the state of West Virginia. The settlement covered conduct that occurred between 2001 and 2005, "involving the sale of payment protection and the Credit Recovery

21

One's payment protection plans;[15] (4) formal and informal inquiries from various governmental agencies related to the payment protection products;[16] and (5) settlements between two of Capital One's competitors and various regulatory agencies concerning the competitors' sales practices for add-on products.[17] These red flags meet the criteria to serve as red flags under Delaware law because they all involve the sale and marketing of the payment protection plans and thus bear some resemblance to the allegations of wrongdoing at the call centers. It is therefore plausible that these incidents could have alerted defendants that the Bank needed to implement more controls or otherwise scrutinize more closely and alter the practices at the call centers.

## 2.

This does not end the analysis on whether the breach of the duty of loyalty claim based on red flags has been adequately pled. Delaware law makes clear that plaintiffs must also plead sufficient facts to give rise to a plausible inference that defendants were aware of the red flags. Under Delaware law, red flags "are only useful when they are either waved in one's face or

Services line of business." State of West Virginia Office of the Attorney General, Press release, January 17, 2012.

[15] In December of 2010, a Florida federal court approved a global settlement of Capital One's "Payment Protection Class Actions." The Payment Protection Class Actions challenged "various marketing practices relating to the payment protection product." This red flag was not included in the original complaint and was only raised in plaintiffs' opposition to defendants' motions to dismiss.

[16] Capital One's Annual Report for 2009 indicated that it was "subject to formal and informal inquiries from various governmental agencies related to the payment protection product." Annual Report (Form 10-K) at 162 (Feb. 26, 2010). This red flag was also not included in the original complaint and was only raised in plaintiffs' opposition to defendants' motion to dismiss.

[17] In June 2000, Providian Financial Corporation entered into a $300 million settlement with the OCC and the San Francisco District Attorney regarding the sale and marketing of Providian's add-on products. Additionally, during the summer of 2011, the CFPB and the Federal Deposit Insurance Corporation investigated Discover Financial Service's payment protection plan sales practices, and Discover ultimately paid $200 million in fines and restitution. This red flag was not included in the original complaint and was only raised in plaintiffs' opposition to defendants' motion to dismiss.

displayed so that they are visible to the careful observer." *Wood*, 953 A.2d at 143 (quoting *In re Citigroup*, 2003 WL 21384599, at *2. Plaintiffs allege three means by which defendants plausibly became aware of the red flags. Specifically, plaintiffs allege: (1) that defendants should have been aware of the red flags "because of their executive positions and/or access to Capital One's internal information," or through the course of their daily responsibilities (Compl. at ¶ 26); (2) that defendants should have been aware of some of the red flags because the red flags appeared in Capital One's annual reports; and (3) that the five defendants who are members of the Audit and Risk Committee (the "ARC") should have acquired information about the red flags through their duties on the ARC (Compl. at ¶ 29).

The first of these means falls short of raising a plausible inference that defendants indeed learned of the red flags. Plaintiffs point to cases where courts have concluded that defendants must have learned about the red flags through the normal performance of their duties and because of the magnitude and duration of the wrongful conduct. Yet, all of plaintiffs' cases are distinguishable because they demonstrate clearer director knowledge and more pervasive and egregious violations.[18]

---

[18] The cases cited by plaintiff in support of this type of knowledge are easily distinguished. There are no allegations here that reports of settlements related to the wrongdoing were made to the board of directors, as there were in *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010). Nor do plaintiffs allege that there were numerous regulatory inspections, formal warning letters sent to the company, or remediation procedures put in place by the federal agencies, as there were in *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003). Plaintiffs do not allege that the wrongdoing at the call centers was widely publicized or that it drew commentary from the analyst community, as it did in *Abbott*. *Id.* at 808-09. Similarly, in *McCall*, 239 F.3d 808, 824 (6th Cir.), there were specific facts in the complaint detailing how the red flags were brought to the audit committee's attention, how certain directors had attended meetings where the allegedly improper practices were discussed, and how certain directors had even lobbied the government to approval for the acquisitions in question. *McCall*, 239 F.3d at 820-21. No such facts are alleged here.

On the other hand, the second and third means plaintiffs allege—that defendants learned about some of the red flags through the annual reports and that five of the directors learned about some of the red flags through their service on the audit committee—pass muster at this pleading stage. It is a plausible inference that the directors were aware of the British FSA settlement, the 2012 settlement with the West Virginia Attorney General, the settlement of Capital One's "Payment Protection Class Actions," and the formal and informal inquiries from various governmental agencies related to the payment protection product. Surely, it can be plausibly inferred that directors read their company's annual report. It is also plausible that the five directors that serve on the ARC learned of these red flags through their service on the ARC.[19] The settlements between two of Capital One's competitors and various regulatory agencies concerning the competitors' sales practices for add-on products were not disclosed in the annual reports, and it is not clear how the directors would have learned of these settlements by serving on the ARC. As such, plaintiffs have adequately pled knowledge for the four red flags stated above, but plaintiffs will need to plead additional facts that raise a plausible inference that defendants learned about the settlements between the regulatory agencies and Capital One's competitors.

3.

---

[19] Pursuant to Capital One's Audit and Risk Committee Amended and Restated Charter, the ARC "is appointed by the Board of Directors…to assist the Board in monitoring (i) the integrity of the financial statements and internal controls of the Corporation; [and] (ii) the compliance by the Corporation with legal and regulatory requirements." Capital One ARC Charter at 1. Under the Charter, the ARC members' duties include "[r]eview[ing] with management…the Corporation's policies and internal controls with respect to compliance with applicable laws and regulations." *Id.* at 4. Additionally, the ARC is charged with "[r]eview[ing] and respond[ing] to any material reports or inquiries received from, and any reports of examination submitted by, the various federal and state financial institution regulatory authorities and management's responses to such reports or inquiries." *Id.*

Finally, to survive defendants' motion to dismiss under Rule 12(b)(6) and Rule 8, plaintiffs must plead that defendants acted in bad faith in failing to take action in light of these red flags.[20] Although as noted *supra*, Rule 9(b)'s requirements for pleading fraud are inapplicable to these complaints, the same conclusion does not obtain to Rule 9(b)'s pleading requirements for the condition of a person's mind. Specifically, Rule 9(b) states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b), Fed. R. Civ. P. Bad faith constitutes a condition of a person's mind and is thus governed by this Rule. Plaintiffs have alleged bad faith generally, and thus the complaints satisfy this pleading requirement.

In sum, plaintiffs have pled five plausible red flags: (1) Capital One Bank (Europe) Plc.'s 2007 settlement with the British Financial Services Authority; (2) Capital One's 2012 settlement with the West Virginia Attorney General; (3) the settlement of a series of class actions concerning Capital One's payment protection plans; (4) formal and informal inquiries from various governmental agencies related to the payment protection products; and (5) settlements between two of Capital One's competitors and various regulatory agencies concerning the competitors' sales practices for add-on products. Plaintiffs have also adequately pled director knowledge for all of these red flags except the settlements between two of Capital One's competitors and the regulatory agencies. And, plaintiffs have met Rule 9(b)'s pleading requirements by pleading bad faith generally.

Accordingly, with respect to the requirements of Rule 8 and *Iqbal/Twombly*, plaintiffs will be permitted to re-plead their claims based on the following red flags because these red flags

---

[20] Plaintiffs have sufficiently pled that defendants acted in bad faith for purposes of Rule 8 and Rule 12(b)(6), although that does not necessarily mean that they have done so with the specificity required to satisfy the requirements of Rule 23.1.

do not appear in the complaint and are only found in plaintiffs' subsequent briefs: (1) the

settlement in a series of class actions concerning Capital One's payment protection plans; (2)

formal and informal inquiries from various governmental agencies related to the payment

protection products; and (3) settlements between two of Capital One's competitors and various

regulatory agencies concerning the competitors' sales practices for add-on products.   With

respect to the settlements between Capital One's competitors and the regulatory agencies,

plaintiffs will also be permitted to re-plead defendants' knowledge of those settlements.

However, plaintiffs are not permitted to re-plead claims based on the following red flags because

these cannot possibly serve as red flags, so re-pleading would be futile: (1) the suit filed by the

Mississippi Attorney General against Capital One in June 2012 for allegedly enrolling customers

in payment protection plans without customers' consent; (2) regulatory agencies' public

statements that these agencies intended to begin enforcing more vigorously consumer protection

laws related to the sales of credit card add-on products; and (3)  the February 2010 consent order

between the Bank and the OCC concerning the Bank's account closing processes from January

1, 2004 through October 31, 2006.

## V.

Defendants also assert that plaintiffs' complaints should be dismissed because plaintiffs

have failed to plead with particularity, as required by Rule 23.1, Fed. R. Civ. P.[21], the reasons

that they have not made demand of Capital One's board of directors.  Delaware law require that

plaintiffs in a shareholder derivative action either make demand of the corporation's board of

---

[21] It is unnecessary to conduct an analysis under Rule 23.1, Fed. R. Civ. P., with respect to
plaintiffs' allegations of corporate waste and unjust enrichment because these allegations fail to
state a claim under Delaware law.

directors prior to bringing a derivative action or plead with particularity the reasons that making demand would be futile.[22] Plaintiffs have not satisfied this requirement.

The director demand requirement is premised on the "basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors," not the shareholders. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991). In a shareholder derivative action, shareholders seek to step into the shoes of the directors and initiate litigation on behalf of the corporation. Shareholders must make demand or explain in detail why they are not doing so in order to avoid situations where shareholders usurp the directors' role. Under Delaware law, "directors are entitled to the *presumption* that they were faithful to their fiduciary duties," and when plaintiffs fail to make demand, plaintiffs bear the burden of overcoming that presumption. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004); *Grobow v. Perot*, 539 A.2d 180, 187, 190 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Two cases, *Aronson v. Lewis*[23] and *Rales v. Blasband*,[24] set the legal standard for determining whether a complaint alleging demand futility will survive a motion to dismiss under

---

[22] Capital One is incorporated under the laws of the state of Delaware, and thus Delaware law governs the internal affairs of the corporation and specifically provides the criteria for assessing the adequacy of a claim that a demand on Capital One's directors would be futile. *See Kamen v. Kemper Financial Srvc. Inc.*, 500 U.S. 90, 108-09 (1991) (holding that in analyzing the futility exception in a derivative action, a court must apply the demand futility exception as it is defined by the law of the state of incorporation); *Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169, 1182 (E.D. Va. 1995) (holding that "[i]n general, the internal affairs of a corporation are governed by the law of the state of incorporation."); *Firestone v. Wiley*, 485 F.Supp. 2d 694, 701 (E.D.Va. 2007) (noting that *Kamen* held that federal courts must apply the demand futility exception provided by the law of the state of incorporation).

[23] 473 A.2d 805 (Del. 1984).

Rule 23.1. *See Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). *Aronson* provides the standard when it is alleged that "the directors made a conscious business decision in breach of their fiduciary duties." *Wood*, 953 A.2d at 140. *Rales* provides the test for a situation where, as here, a board of directors is alleged to have violated its oversight duties, rather than to have engaged in a conscious business decision. *Wood*, 953 A.2d at 140. The *Rales* test provides that for demand to be excused, plaintiffs must plead particularized facts establishing a reason to doubt that "the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. To show that the directors lack independence, plaintiffs must demonstrate not just that the directors face some risk of liability, but that their actions were so egregious that "*a substantial likelihood of director liability*" exists. *Aronson*, 473 A.2d at 815 (emphasis added); *Wood*, 953 A.2d at 140-41, n. 11.

It should be noted at the outset that there are two categories of defendants here: directors and officers. Only one defendant, Mr. Fairbank, is both a director and an officer. Plaintiffs have not pled any particularized facts indicating that the directors would be unable to evaluate independently and disinterestedly whether Capital One should sue the officers, or for that matter, the third-party call center operators. Therefore, plaintiffs have not adequately complied with Rule 23.1's requirement of pleading with particularity the reasons for not making demand of the board with regard to bringing suit against the officers for the acts alleged in the complaints. Nor have plaintiffs forecasted any facts suggesting that the directors would be unable to make an independent and disinterested decision regarding a demand that they sue the officers for these acts. Accordingly, the derivative claims against the officers in the complaints must be dismissed.

---

[24] 634 A.2d 927 (Del. 1993).

28

The question whether Delaware law requires plaintiffs to demand that the directors sue themselves stands on different footing. Plaintiffs assert that a demand that would ask the directors to bring suit against themselves is futile because the directors would be unable to exercise their independent and disinterested business judgment with respect to such a demand. Plaintiffs essentially assert that futility is established any time directors would be asked to sue themselves. But, as it happens, this is not the precisely correct standard under Delaware law. Instead, to show futility and excuse the requirement for demand, plaintiffs must demonstrate through allegations in the complaints not just that the directors face some risk of liability, but that their actions were so egregious that "*a substantial likelihood of director liability*" exists.[25] *Aronson*, 473 A.2d at 815 (emphasis added). The "mere threat" of personal liability is insufficient. *Id.*

Additionally, where, as here, corporate charters, contracts, or other mechanisms exculpate directors from liability for certain actions, "a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *Wood*, 953 A.2d at 141 (citing *Guttman v. Huang*, 823 A.2d 492, 501 (Del.

---

[25] Although there is some force to the notion that it is always futile to ask directors to sue themselves, nonetheless settled Delaware law requires that this be done unless the pleadings show that the majority of the directors face a substantial likelihood of liability. The "substantial likelihood of liability" test strikes a balance between (1) the principle that ordinarily directors, not shareholders, are presumed to act in the best interest of the corporation and make decisions on behalf of the corporation and (2) the principle that shareholders should have a remedy when directors fail to act on behalf of a corporation. Should plaintiffs fail to re-plead successfully their assertion that demand would be futile, they will be required to make demand of Capital One's board of directors. Should the board decline to sue themselves after demand is made, plaintiffs may seek judicial review of the board's decision not to bring a suit, but the reviewing court will evaluate the decision in accordance with the business judgment rule. *See Spiegel v. Buntrock*, 571 A.2d 767, 776 (Del. 1990) (citing *Aronson*, 473 A.2d at 813; *Zapata Corp. v. Maldonado*, 430 A.2d 779, 784 n.10 (Del. 1981)); *See also* Stephen M. Bainbridge, *Corporate Law* 211 (2nd ed. 2009).

Ch. 2003)). Where directors are exculpated except for claims based on bad faith, plaintiffs must

plead particularized facts showing that the directors acted with scienter. *Id.*; *Stone v. Ritter*, 911

A.2d 362, 370 (Del. 2006). In other words, because directors can only be held liable based on a

bad faith decision not to take action, plaintiffs must plead facts from which a court may infer that

"the directors knew that their failure to act would have breached their fiduciary duties to the

corporation, or that their conduct was otherwise 'legally improper.'" *Intel*, 621 F. Supp. 2d 165,

171 (D. Del. 2009); *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 559 (D.N.J.

2011); *Wood*, 953 A.2d at 141.

Plaintiffs' complaints do not plead facts with particularity that demonstrate a substantial

likelihood of director liability. Although the complaints adequately plead that five red flags

could have alerted the directors to wrongdoing at the call centers, the complaints fail to plead, as

required, the knowledge and bad faith requirements as to each of the individual directors. *See*

*Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007).

In order for the five red flags to have warned the directors of wrongdoing at the Bank, the

directors must have somehow become aware of these red flags. *See Wood*, 953 A.2d at 143.

Two theories of director knowledge survived dismissal under Rule 8 and Rule 12(b)(6).

Plaintiffs first claim that the directors should have been aware of four of the red flags because

those red flags were disclosed in Capital One's annual reports. Plaintiffs do not specify how

many of the directors signed the 10-Ks, although some, if not all, of them clearly did. In this

case, because the red flags were disclosed in the annual report, defendants have successfully pled

director knowledge based on this theory. Although defendants point to at least one case where

the Delaware Supreme Court held that a board's execution of financial statements, without more,

was "insufficient to create an inference that the directors had actual or constructive knowledge of

any illegality," *Wood*, 953 A.2d at 142, that case is distinguishable. *Wood* involved a case of misstated financials, and the Delaware Supreme Court held that pleading that a director had signed the financials was not sufficient to plead that the director knew the financials were misstated. *Id.* That is not the situation here. In the current case, the four red flags were explicitly disclosed in the financials, not concealed within a misstatement. Therefore, plaintiffs have pled with particularity that the directors could have learned about the red flags through the disclosures in the annual reports.

Plaintiffs also claim that at least the five members of the board who sit on Capital One's Audit and Risk Committee ("ARC") must have known about the red flags. Plaintiffs assert that one of the ARC's principal duties is "to assist the Board in monitoring…compliance by the corporation with legal and regulatory requirements…and the process by which management assesses and manages risk." Capital One ARC Charter at 1. Plaintiffs also assert that ARC members have specific duties, including "[r]eview[ing] with management and the Corporation's senior internal auditing executive the Corporation's policies and internal controls with respect to compliance with applicable laws and regulations, and oversee[ing] the Corporation's risk management and risk assessment activities with respect thereto." *Id.* at 4. Finally, the ARC is supposed to "[r]eview and respond to any material reports or inquiries received from, and any reports of examination submitted by, the various federal and state financial institution regulatory authorities and management's responses to such reports or inquiries." *Id.*

Plaintiffs incorrectly assert that because ARC members have certain duties under the ARC charter, knowledge of these red flags can be inferred from committee membership. Delaware law does not allow knowledge to be inferred from committee membership alone and instead requires plaintiffs to allege with particularity specific facts evidencing that the members

31

of the committee likely knew about the red flags. *In re Citigroup*, 964 A.2d at 135.[26] As the Delaware Court of Chancery explained, "[a]lthough the members of the [Audit and Risk Management ("ARM")] Committee were charged with reviewing and ensuring the accuracy of Citigroup's financial statements under the ARM Committee charter, director liability is not measured by the aspirational standard established by the internal documents detailing a company's oversight system." *Id.* Plaintiffs have failed to plead this theory of knowledge in accordance with Rule 23.1.

Plaintiffs' theories of director knowledge must survive one additional hurdle under Rule 23.1. It is not enough for plaintiffs to plead that the directors as a whole became aware of the red flags because they were disclosed in the financial statements. Plaintiffs must plead with particularity that each individual director was aware of the red flags. *See Citigroup*, 964 A.2d at 134. As the Delaware Chancery Court has stated, "[a] determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants." *Id.* Put differently, under Delaware law, "a derivative complaint must plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand. *Desimone v. Barrows*, 924 A.2d at 943 (emphasis original). Plaintiff's allegations

---

[26] *See also Desimone*, 924 A.2d at 939-40 (Del. Ch. 2007) (holding that mere membership on the audit committee or board of directors was not enough to impose liability and that plaintiffs must instead plead "the existence of facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed"); *In re Bidz.com, Inc. Derivative Litig.*, 773 F. Supp. 2d 844, 858 (C.D. Cal. 2011) (finding that under Delaware law, "[t]he mere fact that [individual defendants] served on the Audit Committee are insufficient to establish bad faith").

treat the individual defendants as a group, and knowledge is not pled as to each individual director. Plaintiffs' claims must therefore be dismissed.

Finally, plaintiffs have not adequately pled that defendants failed to act on any of the alleged red flags in bad faith, as would be required to hold the directors liable for a breach of the duty of loyalty. Capital One's Certificate of Incorporation exempts the directors from liability for everything except breaches of the duty of loyalty and acts performed in bad faith. When a corporation has put such provisions in place, Delaware law requires plaintiff to "plead facts demonstrating that Defendants acted with scienter." *In re Intel Corp. Derivative Litig.*, 621 F. at 171. This is a difficult standard to meet. As the Delaware Supreme Court said in *Wood v. Baum*, where "directors are exculpated from liability except for claims based on fraudulent, illegal or bad faith conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had actual or constructive knowledge that their conduct was legally improper." *Wood*, 953 A.2d at 141. Like knowledge of the red flags, bad faith must be pled with respect to each director individually. *See Citigroup*, 964 A.2d at 134; *Desimone*, 924 A.2d at 943. Plaintiffs have not pled any particularized facts suggesting that the directors knew or had constructive knowledge that their conduct in failing to respond to the red flags was legally improper, so this requirement is not met. In fact, plaintiffs have not attributed any knowledge to any individual director and have instead treated the directors as a group.

In summary, plaintiffs have failed to plead with particularity that making demand of the Board would be futile. They have offered absolutely no evidence that the directors would be unable to make an independent assessment of a demand that they sue the officers. They have also failed to plead particularized facts indicating that the directors face a substantial likelihood of liability and would therefore be unable to evaluate independently a demand that they sue

33

themselves. Therefore, the suit must be dismissed in accordance with Rule 23.1. Plaintiffs will be permitted to re-plead their assertion that demand would be futile only with respect to claims against the directors.

## VI.

Defendants next assert that plaintiffs' complaints should be dismissed because they have failed to allege adequately that they have continuously owned Capital One's stock. Rule 23.1(b)(1) states that the complaint must "allege that the plaintiff was a shareholder or member at the time of the transaction complained of." Some circuits have also interpreted Rule 23.1 to require that plaintiffs continue to hold shares at the time the suit is filed. *See, e.g. Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983) ("Fed.R.Civ.P. 23.1 requires that a derivative plaintiff be a shareholder at the time of the alleged wrongful acts and that the plaintiff retain ownership of the stock for the duration of the lawsuit."); *Schilling v. Belcher*, 582 F.2d 995, 999 (5th Cir.1978).

In the complaints, each plaintiff states that the plaintiff "is and was a shareholder at all relevant times." (Compl. ¶ 10). Defendants assert that this "general" statement is not enough to satisfy the contemporaneous ownership pleading standard. Defendants go on to note, however, that the Fourth Circuit has not addressed the contemporaneous ownership pleading standard of Rule 23.1. Defendants' motion to dismiss based on a failure to adequately allege continuous ownership of Capital One's stock is granted, but plaintiffs are permitted to re-plead their ownership information, including whether they held the shares while the alleged misconduct was occurring and whether they continued to hold shares at the time the suit was filed.

## VII.

Finally, defendants assert that plaintiffs' complaints should be dismissed because plaintiffs have not verified the complaints. Rule 23.1 requires that shareholder derivative complaints be verified. As the Northern District of Illinois has stated, "Rule 23.1's verification requirement [exists] to ensure that the court will not be used for 'strike suits' and that the plaintiffs have investigated the charges and found them to be of substance. *Levine v. Prudential Bache Properties, Inc.*, 855 F. Supp. 924, 942 (N.D. Ill. 1994). Plaintiffs must verify their amended complaint, should they choose to re-plead.

## VIII.

In summary, defendant's motion to dismiss must be granted in part and denied in part. Specifically,

> (i) Defendants' motion to dismiss under Rule 12(b)(6) must be granted without leave to amend as to plaintiffs' claims for corporate waste and unjust enrichment because plaintiffs have neither alleged nor forecasted facts sufficient to state a claim upon which relief can be granted.

> (ii) Defendants' motion to dismiss under Rule 12(b)(6) must be granted without leave to amend as to plaintiffs' claims for a breach of the duty of loyalty based on a *Caremark* violation for failing to implement any controls or engage in any monitoring because plaintiffs have neither alleged nor forecasted facts sufficient to state this type of *Caremark* claim upon which relief can be granted.

> (iii) Defendants' motion to dismiss under Rule 12(b)(6) must be granted without leave to amend as to plaintiffs' claims for a breach of the duty of loyalty based on three of the alleged red flags because plaintiffs have neither alleged nor forecasted facts sufficient to state a breach of the duty of loyalty claim based on these alleged red flags upon which relief can be granted.

> (iv) Defendants' Rule 12(b)(6) motion to dismiss plaintiff's claim for breach of the duty of loyalty based on two red flags must be denied, namely: (1) Capital One Bank (Europe) Plc.'s 2007 settlement with the British Financial Services Authority ("FSA");

35

and (2) Capital One's 2012 settlement with the West Virginia Attorney General.

(v) Defendants' motion to dismiss under Rule 12(b)(6) must be granted with leave to amend the breach of a duty of loyalty claim based on the three remaining red flags, namely: (1) the settlement in a series of class actions concerning Capital One's payment protection plans; (2) the formal inquiries from various governmental agencies related to the payment protection products; and (3) the settlements between two of Capital One's competitors and various regulatory agencies.[27]

(vi) Defendant's motion to dismiss must be granted without leave to amend with respect to plaintiffs' failure to make demand for claims against the officers.

(vii) Defendants' motion to dismiss for failure to comply with Rule 23.1 must be granted with leave to amend with respect to the claims brought against the directors for breach of the duty of loyalty based on five red flags, namely: (1) Capital One Bank (Europe) Plc.'s 2007 settlement with the British Financial Services Authority ("FSA"); (2) Capital One's 2012 settlement with the West Virginia Attorney General; (3) the settlement in a series of class actions concerning Capital One's payment protection plans; (4) the formal inquiries from various governmental agencies related to the payment protection products; and (5) settlements between various regulatory agencies and two of Capital One's competitors. Should plaintiffs choose to file an amended complaint in this regard, they must allege particularized facts with respect to each director that would demonstrate that the director had knowledge of the red flags and failed to heed the warnings provided by the red flags in bad faith.

(viii) Should plaintiffs wish to make a demand, the matter will be stayed pending completion of the demand process.

(ix) Should plaintiffs choose to file an amended complaint, they must adequately plead their continuous ownership of Capital One stock.

(x) Should plaintiffs choose to file an amended complaint they must verify their complaint.

---

[27] Because the cases have been consolidated under case number 1:12-cv-1100, only one amended complaint should be filed.

An appropriate Order will issue.

Alexandria, Virginia
June 21, 2013

_____
T. S. Ellis, III
United States District Judge