**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| IN RE CAPITAL ONE DERIVATIVE SHAREHOLDER LITIGATION | Lead Case No. 1:12cv1100 (TSE/TCB) |
| | (Consolidated with Case No. 1:12cv1217) |
| This Document Relates to: | |
| ALL ACTIONS | |

**VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE**
**COMPLAINT FOR BREACH OF FIDUCIARY DUTY**

**INTRODUCTION**

1.      This is a shareholder derivative action by plaintiffs Iron Workers Mid-South Pension Fund and Kim Barovic ("Plaintiffs") on behalf of nominal defendant Capital One Financial Corporation ("Capital One" or the "Company") against certain of its current and former officers and directors for breach of fiduciary duty.  Defendants are current and former members of Capital One's Board of Directors (the "Board") – Richard D. Fairbank ("Fairbank"), Patrick W. Gross ("Gross"), Ann Fritz Hackett ("Hackett"), Lewis Hay, III ("Hay"), Pierre E. Leroy ("Leroy"), Mayo A. Shattuck, III ("Shattuck"), Bradford H. Warner ("Warner"), and Edward R. Campbell ("Campbell").[1]

2.      Based in McLean, Virginia, Capital One is one of the Nation's largest issuers of consumer credit and debit cards products.  These products include credit card "add-on" products such as "Payment Protection" and "Credit Monitoring."  Capital One's "Payment Protection" products purportedly allow consumers to request that the Company cancel up to twelve months of minimum payments if they become unemployed or temporarily disabled.  Capital One's "Credit

---

[1] Collectively, the "Individual Defendants," who, together with nominal defendant Capital One, are referred to herein as the "Defendants."

Monitoring" products purportedly provide consumers services such as identity-theft protection and daily credit monitoring and notification of suspicious credit transactions.

3.      Between 2010 and 2012, Capital One generated hundreds of millions of dollars in revenues through the marketing and sale of credit card "add-on" products, such as "Payment Protection" and "Credit Monitoring."  However, all of these revenues were not lawfully earned.  In fact, after an extensive examination of Capital One's consumer credit business, the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") discovered that the Company had engaged in myriad of deceptive practices to sell its credit card "add-on" products.  As a result, on July 18, 2012, Capital One was forced to pay $210 million – one of the largest consumer fraud settlements ever – to resolve enforcement actions brought by the CFPB and OCC.  Had the Individual Defendants abided by their fiduciary duties, these improper marketing tactics would not have occurred and the unlawful activity would not have continued for years.  As a result, Defendants are liable to Capital One for the damages.

4.      According to the CFPB and OCC, Capital One directed consumers with low credit scores or low credit limits to call-centers when they called to activate newly issued credit cards.  The consumers were then offered Capital One's Payment Protection and Credit Monitoring "add-on" credit card products.  As a part of high-pressure tactics Capital One representatives used to sell these products, consumers were misled about the benefits of Capital One's Payment Protection and Credit Monitoring "add-on" products, deceived about the nature of the products, misled about the consumer's eligibility for Payment Protection and Credit Monitoring, misinformed about the costs of the products, and, at times, enrolled in Payment Protection and/or Credit Monitoring without their consent.

5.      To remedy these serious violations of the consumer protection laws, including Capital One's failure to adequately monitor vendor call-center sales practices, Capital One was forced to refund approximately $143 million to nearly two million Capital One customers impacted by the Company's unlawful Payment Protection and Credit Monitoring sales practices between 2010 and 2011, and $7 million to Capital One customers impacted by unlawful billing practices associated with the Company's Credit Monitoring products between 2002 and 2011.  In addition, Capital One will pay $25 million in civil money penalties to the CFPB and $35 million in civil money penalties to the OCC.

6.      Moreover, to ensure that consumers are no longer subject to the Company's unlawful and deceptive marketing and sales of credit card "add-on" products, Capital One was forced to also adopt myriad of costly and expensive internal controls and remedial measures.  Among other things, Capital One shall end deceptive marketing of the Payment Protection and Credit Monitoring products, pay Payment Protection claims denied based on ineligibility at enrollment, and submit to independent auditing of the Company's compliance with the terms of the Consent Orders resolving the CFPB and OCC enforcement actions.

7.      Capital One has been, and will continue to be severely injured by the Company's violations of the consumer protection laws.  These violations occurred on Individual Defendants' watch, despite the fact that the Individual Defendants knew that they had a fiduciary duty to cause Capital One to comply with the laws, rules, and regulations applicable to its business and affairs.  By failing to act after numerous red flags concerning Capital One's credit card "add-on" product sales practices, Defendants damaged the Company.  Nevertheless, the Capital One Board has not yet commenced legal action against the Individual Defendants for the breaches of fiduciary duty

described herein.  By this action, Plaintiffs, derivatively on behalf of Capital One, seek to vindicate the Company's claims against its wayward fiduciaries.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over each of the Defendants named herein.  Capital One is a corporation that conducts business and maintains operations in this District.  The remaining Individual Defendants have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this District Court permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complaint of herein occurred in this District, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Capital One's shareholders.  Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had effect in this District.

## PARTIES

**Plaintiffs**

10.     Plaintiff Iron Workers Mid-South Pension Fund is a shareholder of Capital One and has continuously been a shareholder since it first acquired the Company's stock on October 13, 2009.

11.     Plaintiff Kim Barovic is a shareholder of Capital One and has continuously been a shareholder since she first acquired the Company's stock on December 3, 1997.

**Nominal Defendant**

12.     Nominal Defendant Capital One is a Delaware corporation with principal executive offices located at 1680 Capital One Drive, McLean, Virginia.  Capital One is a diversified financial services holding company.  The Company, through its subsidiaries, operates under three primary

business segments: Credit Card, Consumer Banking, and Commercial Banking. Capital One's credit card segment accounts for approximately half of its loan in terms of dollar value.  Capital One Bank (USA), National Association ("Capital One Bank") offers credit and debit card products, other lending products, and deposit products in the United States.  In Europe, Capital One Bank operates through Capital One (Europe) plc ("COEP"), which provides credit card and installment loans in the United Kingdom.  In connection with its credit card business, Capital One has historically offered various products and services such as Payment Protection and Credit Monitoring, both domestically and in the U.K.

**Individual Defendants**

13.     Defendant Fairbank is Capital One's Chief Executive Officer ("CEO") and a director and has been since July 1994; Chairman of the Board and has been since February 1995; President and has been since April 2003; and Chairman of Capital One Bank and has been since at least March 2010.  Defendant Fairbank founded Capital One in 1988.  Defendant Fairbank has certified each of Capital One's Forms 10-Q and has signed and certified each of Capital One's Forms 10-K since at least 2003.

14.     Defendant Gross is a Capital One director and has been since February 1995. Defendant Gross was a member of Capital One's Audit and Risk Committee from at least March 2001 to at least May 2013.  Defendant Gross was also Capital One's Presiding Director from at least March 2004 to at least March 2007.  Defendant Gross has signed each of Capital One's Forms 10-K since at least 2003.

15.     Defendant Hackett is Capital One's Lead/Presiding Director and has been since at least March 2008.  Defendant Hackett has been a director of the Company since October 2004; and a director of Capital One Bank and has been since at least March 2010.   Defendant Hackett was a

member of Capital One's Audit and Risk Committee from October 2004 to at least May 2013. Defendant Hackett has signed each of Capital One's Forms 10-K since 2005.

16.     Defendant Leroy is a Capital One director and has been since September 2005. Defendant Leroy was a member of Capital One's Audit and Risk Committee from September 2005 to at least January 2012.  Defendant Leroy has signed each of Capital One's Forms 10-K since 2006.

17.     Defendant Warner is a Capital One director and has been since April 2008. Defendant Warner was a member of Capital One's Audit and Risk Committee from April 2009 to at least May 2013.  Defendant Warner has signed each of Capital One's Forms 10-K since 2009.

18.     Defendant Hay is a Capital One director and has been since October 2003 and a director of Capital One Bank and has been since at least March 2010.  Defendant Hay has signed each of Capital One's Forms 10-K since 2004.

19.     Defendant Shattuck is a Capital One director and has been since October 2003. Defendant Shattuck has signed each of Capital One's Forms 10-K since 2004.

20.     Defendant Campbell was a Capital One director from November 2005 to May 2012. Defendant Campbell signed each of Capital One's Forms 10-K from 2006 to 2012.

## THE AUDIT AND RISK COMMITTEE

21.     The Audit and Risk Committee of the Capital One Board (the "ARC") is responsible for overseeing the Company's accounting, financial reporting, internal controls, and risk assessment and management processes.  More particularly, the Capital One directors designated for service on the ARC are responsible for, among other things, monitoring the integrity of Capital One's financial statements and internal controls; monitoring the Company's compliance with legal and regulatory requirements, including, without limitation federal and state consumer protection laws; and monitoring the processes by which management assesses and manages risk.

22.     The Board has acknowledged that risk management is a critical part of the Company. In doing so, it identified eight critical areas of risk that are constantly being monitored. Two of those areas are compliance risk and legal risk.  As the Company has explained in its Annual Reports since at least the 2003, "[c]ompliance risk is the risk of financial loss due to regulatory fines or penalties, restriction or suspension of business activities or costs of mandatory corrective action incurred by not adhering to applicable laws, regulations, principles and supervisory guidance, as well as our own internal standards intended to adhere to these laws and regulations."  Those same reports describe legal risk "as the risk of material adverse impact due to new or changes in laws and regulations; the drafting, interpretation and enforceability of contracts; adverse decisions or consequences arising from litigation or regulatory scrutiny; the establishment, management and governance of our legal entity structure; or the failure to seek or follow appropriate legal counsel when needed."  Defendants Fairbank, Gross, Hackett, Hay, Leroy, Shattuck, Warner, and Campbell have each signed an Annual Report describing these risks and acknowledging the monitoring of these risks as critical components of the Company's operations.

23.     The ARC, in turn, is a vital part of the Company's internal controls over risk management.  Management reports both trends and compliance results to the ARC.  Legal risks are evaluated by the Company's General Counsel in partnership with Capital One's other risk controls, including the compliance risk control.  In this way, important regulatory and legal trends, as well as any rulings or regulations affecting the Company, are presented by senior management directly to the ARC for its members' consideration.

24.     During the relevant time period, the ARC consisted of the following individuals: defendants Gross, Hackett, Leroy, and Warner.  Each of these defendants signed the Company's Annual Reports, which stated that Capital One's controls are effective and working and which

explained the compliance and legal risks reporting structure.  The ARC met twelve times in 2010 and 2011, and fourteen times in 2012.

## THE COMPANY GENERATES HUNDREDS OF MILLIONS OF DOLLARS FROM "ADD-ON" PRODUCTS ILLEGALLY OBTAINED

25.     Capital One is one of the Nation's largest issuers of consumer credit and debit card products, including Payment Protection and Credit Monitoring.  Payment Protection purportedly allows consumers to request that the Company cancel up to twelve months of minimum payments if they become unemployed or temporarily disabled.  Credit Monitoring purportedly provides consumers services such as identity-theft protection, daily credit monitoring, and notification of suspicious credit transactions.  Between at least 2010 and early 2012, Capital One generated hundreds of millions of dollars in revenue from the sale of credit card "add-on" products such as Payment Protection and Credit Monitoring.

26.     Since at least 2010 to early 2012, when consumers with low credit scores or low credit limits attempted to activate newly issued credit cards they were directed by Capital One Bank to call-centers.  The consumers were then offered credit card "add-on" products such as Payment Protection and Credit Monitoring.  As a part of the high-pressure and deceptive tactics used by Capital One Bank's representatives, consumers were: (i) unlawfully misled about the benefits of Payment Protection and Credit Monitoring; (ii) deceived about  the nature of the products; (iii) misled about the consumer's eligibility for Payment Protection and Credit Monitoring; (iv) misinformed about the costs of the products; and (v) sometimes enrolled in Payment Protection and/or Credit Monitoring without their consent.

27.     In fact, after an in-depth examination of Capital One Bank's credit card business, the OCC found that the bank's representatives engaged in myriad of deceptive tactics to sell the

Company's Payment Protection and Credit Monitoring products.  According to the OCC Consent

Order dated July 17, 2012:

(2)    From August 1, 2010 through December 17, 2011, Cardholders who activated, by telephone, nearly issued and re-issued credit cards that were in the Bank's subprime portfolio or were in the Bank's prime portfolio with an initial credit line of $5,000 or less were routinely routed to a Bank Vendor's call center.  The Bank Vendor call agents marketed and sold the Payment Protection and/or Intersections Credit Monitoring products during these credit card activation telephone calls.

(3)    From August 1, 2010 through December 7, 2011, during the credit card activation telephone calls described in Paragraph (2) of this Article, some of the Bank Vendor call agents utilized certain high-pressure sales tactics and made materially false, deceptive, or otherwise misleading oral statements relating to the costs, coverage terms, benefits, and other features of the Payment Protection and Intersections Credit Monitoring products marketed and sold to the Cardholders described in Paragraph (2) of this Article.

(4)    From August 1, 2010 through January 9, 2012, Cardholders with credit cards that were in the Bank's subprime portfolio and were in the Bank's prime portfolio with an initial credit line of $5,000 or less who called to cancel their enrollment in the Payment Protection and/or Intersections Credit Monitoring products were routinely routed to a Bank Vendor's call-center where the Bank Vendor call agents engaged in efforts to retain the Cardholders in the payment Protection and/or Intersections Credit Monitoring products during these cancellation telephone calls.

(5)    From August 1, 2010 through January 9, 2012, during the cancellation telephone calls described in Paragraph (4) of this Article, some Bank Vendor call agents engaged in certain high-pressure retention tactics and made many of the same materially false, deceptive, or otherwise misleading oral statements as in the credit card activation telephone calls.

(6)    From August 1, 2010 through January 9, 2012, the Bank failed to maintain effective risk management and control processes over the marketing and sales by Bank Vendors of the Payment Protection and Intersections Credit Monitoring products to the Cardholders described in Paragraphs (2) and (4) of this Article.

(7)    Until 2001, the Bank and Bank Vendors marketed and sold the Affinion Credit Monitoring products to consumers.

(8)    From May 13, 2002 to May 31, 2011, the Bank and Bank Vendors marketed and sold the Intersections Credit Monitoring products to consumers.

(9)    Following enrollment in the Affinion Credit Monitoring and Intersections Credit Monitoring products, Cardholders and Customers were in some cases required to provide additional verification information or proper authorization before their

credit bureau reports could be accessed. Until the Cardholder or Customer provided this information or authorization, he or she was in Pending Status and was being billed for, but not receiving the full benefit of, the Affinion Credit Monitoring or Intersections Credit Monitoring product in which he or she was enrolled.

(10)    From May 13, 2002 through May 31, 2011, the Bank billed Cardholders and Customers enrolled in Intersections Credit Monitoring products that were in Pending Status for the full fee of the product, even though the Cardholders and Customers were not receiving the full benefit of the product.

(11)    From March 1, 2006 through June 21, 2011, the Bank filed Affinion Customers enrolled in Affinion Credit Monitoring products that were in Pending Status for the full fee of the product, even though the Customers were not receiving the full benefit of the product.

28.    Similarly, with respect to the sale tactics used by Capital One Bank's representatives to sell Payment Protection and Credit Monitoring products, the CFPB concluded that consumers were:

- **Misled about the benefits of the products**: Consumers were led to believe that the product would improve their credit scores and help them increase the credit limit on their Capital One credit card.

- **Deceived about the nature of the products**: Consumers were not always told that buying the products was optional. In other cases, consumers were wrongly told they were required to purchase the product in order to receive full information about it, but that they could cancel the product if they were not satisfied. Many of these consumers later had difficulty canceling when they called to do so.

- **Misled about eligibility**: Although most of the payment protection benefits kicked in when consumers became disabled or lost a job, call center representatives marketed and sold the product to unemployed and disabled consumers whose claims would inevitably be denied.

- **Misinformed about cost of the products**: Consumers were led to believe that they would be enrolling in a free product rather than making a purchase.

- **Enrolled without their consent**: Some call center vendors processed the add-on product purchases without the consumer's consent. Consumers were then automatically billed for the product and often had trouble cancelling the product when they called to do so.

29.     Based on these findings, the OCC concluded that Capital One Bank's sales tactics and billing practices for Payment Protection and Credit Monitoring products violated sections 5 and 6 of the Federal Trade Commission Act, stating:

> (12)     By reason of the foregoing marketing, sales, and retention practices of its Bank Vendors for Payment Protection and Intersections Credit Monitoring products as described in Paragraphs (2) to (6) of this Article, the Bank engaged in unfair and deceptive practices of Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §45(a)(1).

> (13)     By reason of the foregoing billing practices for Affinion Credit Monitoring and Intersection Credit Monitoring products as described in Paragraphs (9) to (11) of this Article, the Bank engaged in unfair practices in violation of Section 5 of the FTC Act.

> (14)     The Bank's violations of Section 5 of the FTC Act caused substantial consumer injury or were likely to cause substantial consumer injury.

> (15)     From August 1, 2010 through December 17, 2011, the Bank violated 12 C.F.R. §37.8 by failing to maintain effective risk management and control processes in connection with the marketing and sale of the Payment Protection product by Bank Vendors.

> (16)     The Bank's violations of Section 5 of the FTC Act and 12 C.F.R. §37.8 are part of a pattern of misconduct that resulted in financial gain to the Bank.

30.     Similarly, the CFPB concluded that Capital One Bank violated sections 1031 and 1036 of the Consumer Financial Protection Act by engaging in deceptive marketing and sales practices, stating:

> The CFPB finds, and the Bank neither admits nor denies, that that Bank has engaged in violations of Sections 1031 and 1036 of the CFPA (collectively, "Section 1036"), 12 U.S.C. § 5536, in connection with the marketing, sales, and operation of the Bank's Payment Protection Products and Credit Monitoring Products that were offered and sold to individual holders of Capital One consumer credit card accounts, during the period between August 1, 2010 and January 9, 2012 (the "Relevant Time Period").

31.     On July 18, 2012, Capital One announced that it had agreed to pay $210 million to resolve enforcement actions brought by the OCC and CFPB.  As a part of the settlements, Capital One Bank refunded approximately $150 million to injured consumers and paid a total of $60 million

in civil monetary penalties.  Additionally, the Company adopted additional internal controls and remedial measures designed to prevent the Capital One's subsidiaries from engaging in future deceptive sales practices in connection with the sale of credit card "add-on" products, such as Payment Protection and Credit Monitoring.

32.     More specifically, as a part of the CFPB settlement, Capital One Bank shall:

i     **End deceptive marketing**:  Capital One Bank must cease all marketing of these products until the Bureau has approved a compliance plant to help ensure these violations do not occur in the future.

i     **Complete repayment plus interest to two million consumers**:  Capital One Bank will pay approximately $140 million to 2 million consumers who initially enrolled in a product on or after August 1, 2010, or who tried to cancel a product on or after August 1, 2010, but kept the product after speaking with a call center representative.  In addition the cost of the product, cardmembers will receive a refund of the finance charges associated with the fees paid, any over-the-limit fees resulting from the charge for the product, and interest.

i     **Pay claims denied based on ineligibility at enrollment**:  For any of these eligible consumers whose payment protection claims were previously denied because their loss occurred prior to enrollment (because of unemployment, disability, etc.), Capital One Bank will pay their claims as if they had been eligible, if that amount is greater than the refund for that consumer.

i     **Convenient repayment for consumers**:  If the consumers are still Capital One Bank customers, they will see a credit in their account.  If they no longer have a credit card account with Capital One Bank, they will receive a check.

i     **Independent audit**:  Compliance with the terms of the Consent Order will be assured through the work of an independent auditor.

i     **$25 million penalty**:  Capital One Bank will pay a $25 million in a civil money penalty to the Civil Penalty Fund.

33.     Additionally, with respect to the OCC settlement, Capital One Bank shall pay a $35 million civil monetary penalty.

## NUMEROUS RED FLAGS OF IMPROPER ADD-ON MARKETING TACTICS ARE WAIVED DIRECTLY IN THE INDIVIDUAL DEFENDANTS' FACES

34.     Capital One's settlements with the OCC and CFPB are not first runs-in with regulators over the Company's use of deceptive tactics to sell its credit card "add-on" products.  In fact, the Individual Defendants have received notifications of improper practices concerning credit card services since at least 2004.  Nevertheless, the Individual Defendants failed to take action to correct the illegal practices committed on behalf of the Company.

35.     The OCC sent a letter directly to defendant Fairbank and other CEO's of national banks on September 14, 2004.  The OCC stated that this was an advisory letter to alert the Company and others like it of the OCC's concerns regarding credit card marking and account management practices.  The OCC explained that these practices may entail unfair or deceptive acts or practices and "may expose a bank to compliance and reputation risks."  Among other things, the OCC's advisory letter warned against banks targeting consumers who have limited or poor credit histories with misleading solicitations (in this particular case, credit cards with an "up to" credit limit that is greater than most applicants are likely to receive).  In addition to defendant Fairbank, the members of the ARC received this advisory letter pursuant to the Company's risk management policies because it concerns regulatory trends and potential compliance risks.  Despite receiving this warning, the Individual Defendants refused to ensure that the Company's call centers were not targeting these very types of clients, those with limited or low credit scores, with misleading sales tactics.

36.     This advisory notice was just the beginning.  States across the country began investigating the Company for its marketing and sale of add-on products, particularly Payment Protection products.  In 2005, the Attorney General of West Virginia began an investigation into the Company's sale of Payment Protection.  After years of legal battles concerning whether West Virginia could even conduct its investigation, in 2010, the state filed an action against Capital One

Bank and some of its affiliates in West Virginia.  In January 2012, Capital One Bank entered into a $13.5 million settlement with the West Virginia to resolve alleged consumer protection violations surrounding its Payment Protection programs from 2001 to 2005.  The Company began disclosing the West Virginia lawsuit in its 2009 Form 10-K for the period ended December 31, 2009 ("2009 Form 10-K") filed with the U. S. Securities and Exchange Commission ("SEC") on February 26, 2010, which was signed by defendants Fairbank, Campbell, Gross, Hackett, Hay, Leroy, Shattuck, and Warner.  The Company continued to discuss this lawsuit in every Annual Report until its most recent Form 10-K for the period ended December 31, 2012, filed with the SEC on February 28, 2013.  These same defendants signed each of these Annual Reports on Forms 10-K.

37.     In November 2006, the California Attorney General began an investigation into the Company due to its "substantial concerns about the credit card practices of Capital One."  The California Attorney General sought access to the Company's books and records and interviews with its employees.  After a year and a half of exchanging information with the California Attorney General, on March 1, 2008, Capital One Bank converted its charter to that of a national banking association.  In order to prevent the California Attorney General from pursuing this investigation, Capital One Bank filed an action seeking an injunction in federal court, stating that since it converted its charter, the California Attorney General no longer had power to investigate its credit card policies.  When approving the conversion to a national banking association, defendants Fairbank, Gross, Hackett, Hay, Leroy, Shattuck, Warner, and Campbell must have received information on and considered the different regulatory structure that would be in place with such a change.  This information would include that the OCC would likely now have complete visitorial powers over it, and thus, the California Attorney General would no longer have the power to pursue its demands for information.  Even had this not been the case, a high profile lawsuit such as the Company's suit

against the California Attorney General necessarily required the Board's approval. Finally, because this matter concerns regulatory and legal risk, management discussed it with ARC members, defendants Gross, Hackett, and Leroy.

38.     In February 2007, a British regulator, the Financial Services Authority ("FSA"), fined COEP £175,000 (more than $340,000) finding that the Company's subsidiary did not give adequate information to customers who bought Payment Protection Insurance ("PPI") that they thought would pay off their credit card bills in case they became ill or lost their jobs, the exact wrongdoing that underlies this action. In addition, the FSA stated that the COEP failed to have adequate controls in place. The Company disclosed the FSA lawsuit for the first time in its Annual Report on Form 10-K for the period ended December 31, 2006 ("2006 Form 10-K"), which was filed with the SEC on March 1, 2007. Defendants Fairbank, Campbell, Gross, Hackett, Hay, Leroy, and Shattuck signed this 2006 Form 10-K. The Company's Annual Report on Form 10-K for the period ended December 31, 2007 ("2007 Form 10-K"), filed with the SEC on February 29, 2008, signed by the same defendants, contained a substantially similar disclosure as the 2006 Form 10-K concerning the fined FSA imposed on COEP.

39.     The 2007 settlement with the FSA was not the end of its trouble with the PPI products that the Company, through its subsidiary, marketed and sold in the United Kingdom. Also in 2007, the Competition Commission ("CC") of the Office of Fair Trading ("OFT") initiated a market investigation into the supply of PPI products in the U.K. The CC published its final investigation report on January 29, 2009, which included a number of sale changes and the introduction of annual PPI statement to customers. These changes were scheduled to take effect in 2010. As a result, the Company decided to stop selling PPI to customers in United Kingdom in 2010. The Company disclosed this information in its Annual Report on Form 10-K for the period ended December 31,

2008 ("2008 Form 10-K"), filed with the SEC on February 26, 2009.  The 2008 Form 10-K was signed by defendants Fairbank, Campbell, Gross, Hackett, Hay, Leroy, Shattuck, and Warner.  On information and belief, the decision to stop selling PPI products in the United Kingdom was a Board level decision, which required defendants Fairbank, Campbell, Gross, Hackett, Hay, Leroy, Shattuck, and Warner's approval.  Further, because the CC's investigation and report concerns new regulations and laws, management discussed this issue with the ARC, consisting of defendants Gross, Hackett, Leroy, and Warner.

40.     As disclosed in the Company's Annual Report on Form 10-K for the period ended December 31, 2010 ("2010 Form 10-K"), filed with the SEC on March 1, 2011, and signed by defendants Fairbank, Campbell, Gross, Hackett, Hay, Leroy, Shattuck, and Warner, the new rules imposed by British regulators required COEP to conduct a review of its past PPI sales in the U.K. and, where any systemic issues were identified, to take appropriate remedial action, including proactively contacting non-complainants.

41.     While the British Banker's Association initially challenged these new rules on the basis that the rules had a retrospective effect, a British court upheld them in April 2011.  Capital One completed its review of COEP's PPI business in the second quarter of 2011 and booked a $75 million reserve to cover PPI consumer claims under the new rules.  Due to a steady stream of claims, Capital One increased this reserve by $99 million in the fourth quarter of 2011 and by $82 million in the second quarter of 2012, bringing the total amount reserved to $256 million.  The Company again discussed the new United Kingdom rules regarding PPI products in its Annual Report on Form 10-K for the period ended December 31, 2011 ("2011 Form 10-K"), filed with the SEC on February 29, 2012, and signed by defendants Fairbank, Campbell, Gross, Hackett, Hay, Leroy, Shattuck, and Warner.  Further, the 2011 Form 10-K disclosed that COEP has experienced a significant increase in

PPI complaint volumes and that Capital One was increasing its reserves to deal with its PPI business in the United Kingdom. The 2011 Form 10-K cites the Company's $102 million provision for anticipated refunds to British customers that used COEP's PPI products as a "[k]ey factor[] affecting the results of [the Company's] Credit Card business for 2011." In addition to knowing about the Company's PPI issues from signing multiple annual statements describing them, defendants Gross, Hackett, Leroy, and Warner as members of the ARC, received regular updates on the status of the CC's PPI rulemaking, the Company's internal review, the claims process, and the increasing reserves due to Capital One's United Kingdom PPI business.

42.    In addition to governmental action, consumers have also repeatedly sued the Company's subsidiaries over their marketing practices related to Payment Protection products and other add-on products. The first of these suits was filed on September 28, 2007, in Florida state court. The defendant removed the action to federal court on January 18, 2008. As stated in the Company's 2009 Form 10-K, in September 2009, the U.S. District Court for the Middle District of Florida certified a statewide class action with respect to the marketing of the Payment Protection product in Florida. Then in January 2010, three individual consumers filed lawsuits on behalf of a nationwide class challenging the Capital One Bank's various marketing practices relating to the marketing practices of Capital One's Payment Protection product. The filing of these lawsuits was also disclosed in the Company's 2009 Form 10-K, signed by defendants Fairbank, Campbell, Gross, Hackett, Hay, Leroy, Shattuck, and Warner.

43.    Members of the public specifically cited these consumer class actions and the Company's improper credit card practices when objecting to Capital One's planned acquisition of ING Direct N.V. ("ING Direct"). On June 16, 2011, Capital One announced that it entered into a definitive agreement with ING Groep N.V., whereby, the Company would acquire ING Direct for a

stock and cash mix valued at $9 billion, an amount equal to almost three times the Company's net income for its 2012 fiscal year. Due to the size of this transaction, it required Board approval and the Board needed to monitor the purchase process. The deal could not go through, however, without the approval of the U.S. Federal Reserve. The Federal Reserve held multiple hearings regarding the transaction. During these hearings, members of public objected to the transaction due to Company's track record of exploiting individuals. Some individuals specifically referenced the Company's deceptive marketing practices regarding its credit card add-on products. For example, at the September 20, 2011, meeting, Erica Kuester, speaking on behalf of a member of the Maywood Community Association in Arlington, Virginia, stated that "Capital One is leaving our communities with fewer traditional banking options and more high cost predatory credit cards. In fact, there are class action proceedings underway in Florida, Michigan and Georgia against Capital One regarding alleged unfair and abusive credit card practices." Lee Beaulac, Senior Vice President for Community and Economic Development at Pathstone Corporation speaking on behalf of Charles Harris from Housing Education and Economic Development, similarly stated, "Capital One faces class action litigation for abusive credit card lending and is being investigated by three attorneys general. Meanwhile, in my state of Mississippi, Capital One displays an abysmal record." Josh Silver, Vice President of Research and Policy at the National Community Reinvestment Coalition speaking on behalf of another board member, stated, "We have heard about three attorneys general of states suing Capital One for problematic credit card lending."

44.    A week later, at another public meeting concerning the Capital One-ING Direct transaction, a variety of individuals made similar complaints against Capital One. Peter Clark, Government and Legislative Liaison for Partners in Community Building, a HUD-certified housing counseling and non-profit organization, stated "Capital One would like this Board to believe they act

as Mother Theresa with Articles of Incorporation. Nowhere in their glossy materials or their slick presentations will Capital One discuss the wrath of investigations conducted and ongoing by states attorneys general into its history of deceptive and misleading credit card practices." Tom Feltner, speaking on behalf of Reverend Cathy Palmer, president of Global Network CDC in Chicago, Illinois, stated,  "Capital One's credit card and auto lending are also fraught with problems. Attorneys General across the country have logged thousands of complaints against this bank…. In fact, there are class action proceedings under way in Florida, Michigan and Georgia against Capital One regarding alleged unfair and abusive of credit card practices." Jacqueline A. Hutchinson, Policy Analyst and board member of the Missouri Consumers Council, highlighted that "[a]ttorneys General in Minnesota, West Virginia and California have investigated Capital One for false and misleading credit card marketing."  Finally, Mark Seifert, Executive Director of the East Side Organizing Project, gave specific examples of consumers problems with the Company's Payment Protection plan, stating:

> As I prepared to come here today, we sort of reached out to our members and just heard a couple of stories that I'll just quickly point out some quotes that they gave us on Capital One's abusive practices.  Here's one.
>
> One member said, "The problems started with paying protection insurance sold to me upon opening the account.  The problem was I paid my bill in advance of the due date, then they would add the monthly fee for the insurance after my payment and charge me a late fee because my payment did not include the full amount.  Then at some point, they began charging me an over-the-limit fee because the late fee brought me over the limit.  This went on for a few months before I realized I was being charged the fees.  And their explanation was that the payment protection fee was not included in the minimum payment.  In other words, if I waited for the payment protection to post before making a payment, my payment would most likely be late.  I cancelled the payment protection after that."
>
> * * *
>
> Mr. Flannery simply said, "Yeah, I had a credit card with them. When my workplace closed, I attempted to use the payment protection plan I had paid for, and they delayed the process for so long that by the time I was able to use it, it was too late."

- 19 -

45.     John G. Finneran, Jr., Head of Corporate Reputation and Governance, General Counsel and Corporate Secretary of Capital One was in attendance at these hearings.  Considering the regulatory risk involved in these hearing, Mr. Finneran was required and did report the details of these hearings to the ARC.  Furthermore, because these objections put at risk the Company's $9 billion acquisition, the Board necessarily received updates on the hearings and the objections that were made at them.  Despite hearing complaints directly from customers, references to the class actions challenging the Company's add-on practices, and that these complaints almost scuttled a $9 billion transaction, defendants Fairbank, Campbell, Gross, Hackett, Hay, Leroy, Shattuck, and Warner, still failed to investigate and fix the improper practices connected with the Capital One's sale of add-on products.

46.     The Individual Defendants' failure to act in the face of these overwhelming red flags, brought directly to their attention, is inexcusable.  Individual Defendants as directors of a Delaware corporation are responsible for conducting its business, and therefore, owe the corporation and its shareholders a fiduciary duty to conduct the corporation's operations in accordance with the laws, rules, and regulations applicable to its business and affairs.  The failure to do so constitutes a breach of loyalty, such that the directors may be held liable to the corporation for damages.  Stated differently, as the Delaware Supreme Court opined in *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006), where corporate fiduciaries fail to act in the face of a known legal duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

### DAMAGES TO CAPITAL ONE

47.     Capital One has been, and will continue to be damaged and injured by Defendants' misconduct.  In addition to the $210 million in damages, fines, and penalties the Company must pay to Capital One customers and federal regulators, the Company must also adopt and maintain several

costly internal controls and remedial measures.  The Company also faces significant monetary damages to investigate and potentially settle the State Attorney Generals' actions and consumer lawsuits.  Moreover, Capital One's goodwill, reputation, and standing in the community have been severely impaired, if not irreparably injured.

48.     By contrast, however, Individual Defendants have not fared nearly so badly.  In fact, during their misconduct, the Individual Defendants collectively pocketed millions, if not tens of millions in salary, bonuses, stock options, stock rights, fees, and other payments not justified by Capital One's lawless behavior while under their stewardship.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

49.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

50.     Plaintiffs bring this action derivatively on behalf of Capital One to redress the damage and injuries to the Company as a result of Defendants' breach of fiduciary duty.  Plaintiffs will adequately represent Capital One's interest in the derivative claims.

51.     As of the date of the filing of this Consolidated Amended Complaint, the Capital One Board consists of the following ten individuals: defendants Fairbank, Gross, Hackett, Hay, Leroy, Shattuck, and Warner (as well as non-defendants Peter E. Raskind, Benjamin P. Jenkins, III, and Catherine G. West).  A pre-suit demand upon the Board would have been a futile and useless act, because the Board will not sue, let alone vigorously prosecute the derivative claims asserted against the Defendants herein, because at least half the Board faces a substantial likelihood of liability.

52.     Defendant Fairbank is the Company's CEO and founder.  Further, he is a director of Capital One Bank.  Defendant Fairbank's actions or inaction as an officer of the Company is not subject to the protection of Capital One's exculpation for breaches of the duty of care, which by Delaware law, can only apply to directors. Therefore, defendant Fairbank faces a substantial

likelihood of liability for even grossly negligent actions.  At a minimum, defendant Fairbank was grossly negligent in failing to correct the Company's deceptive marketing practices concerning its add-on products in light of the multiple red flags waved directly in his face.  To start, defendant Fairbank not only signed, but certified every relevant Form 10-K described herein that detailed the wrongful conduct occurring at the Company.    Defendant Fairbank certified and signed the Company's 2006 and 2007 Forms 10-K, which discuss the FSA's fine of the Company due to its marketing of PPI.  He also signed and certified the Company's 2008 Form 10-K, which discusses the CC investigation and the Company's decision to stop selling PPI products in the United Kingdom. Defendant Fairbank also signed and certified the Company's 2009 Form 10-K, which disclosed numerous lawsuits against the Company and its subsidiaries over the misleading marketing practices concerning the sale of Payment Protection products, including the West Virginia Attorney General lawsuit, the Middle District of Florida lawsuit and the court granting that action's motion for class certification, and the filing of a nationwide class action.  Defendant Fairbank signed the Company's 2010 Form 10-K, which disclosed that Capital One needed to review its historical PPI product sales in the United Kingdom.  Finally, defendant Fairbank signed the Company's 2011 Form 10-K, which disclosed the increase in PPI complaints and that PPI refunds were a key factor in the Company's credit card business.  Defendant Fairbank's knowledge is also apparent in light of the OCC's September 14, 2004 advisory letter sent directly to him and the filing of the Company's injunction action against the California Attorney General.  In addition, defendant Fairbank voted on the Company's conversion to a nationally charted bank, which would have included a discussion on the regulation and oversight of the Company and what it would mean to the current investigations into Capital One.  Further, on information and belief, defendant Fairbank either approved or was told of the lawsuit against the California Attorney General.  Finally, defendant Fairbank, as CEO of the

Company, was in charge of implementing the ING Direct acquisition.  Accordingly, he received updates on the Federal Reserve approval process, including the objections to the transaction, which raised the Company's improper add-on practices.  In light of this legion of red flags, defendant Fairbank was at a minimum grossly negligent in failing to take steps to cure the problems overwhelming the Company's marketing practices of add-on products.  Accordingly, defendant Fairbank faces a substantial likelihood of liability and a demand upon him is excused.

53.     Defendant Gross is a long-time director of the Company.  Like defendant Fairbank, defendant Gross signed the Company's 2006-2011 Forms 10-K Annual Reports.  In addition, defendant Gross has been a member of the ARC since at least 2001.  As a member of the ARC, defendant Gross would receive updates on risk trends and new rules and regulations from the Company's management.  As a result, defendant Gross would have discussed and considered with management: (i) the OCC's September 14, 2004 advisory letter to defendant Fairbank; (ii) the 2007 settlement with the FSA; (iii) the Company's ongoing issues with the PPI review and claims occurring in the United Kingdom, including the reasons behind the United Kingdom's rules and the need for Capital One to conduct a review of its records; (iv) the governmental investigations in the Company's credit card practices, including its add-on advertising, such as the California Attorney General's review and West Virginia Attorney General's review, which ultimately led to the filing and settling of an action against the Company; and (v) the consumer class action filed in the U.S. District Court for the Middle District of Florida, which had a class certified, and the filed nationwide class action.  In addition, defendant Gross voted on the Company's conversion to a nationally chartered bank, which would have included a discussion on the regulation and oversight of the Company and what it would mean to the current investigations into Capital One.  As a member of the Board and the ARC, defendant Gross would receive from management updates on the Federal Reserve approval

process concerning the ING Direct transaction, including the objections to the transaction, which raised the Company's improper add-on practices.  In light of these numerous red flags, defendant Gross acted disloyally in failing to take steps to cure the problems overwhelming Company's marketing practices of add-on products.  Accordingly, defendant Gross faces a substantial likelihood of liability and a demand upon him is excused.

54.    Defendant Hackett is also a long-time director of the Company and a director of Capital One Bank.  Like defendant Fairbank, defendant Hackett signed the Company's 2006-2011 Forms 10-K Annual Reports.  In addition, defendant Hackett has been a member of the ARC since 2004.  As a member of the ARC, defendant Hackett would receive updates on risk trends and new rules and regulations from the Company's management.  As a result, defendant Hackett would have discussed and considered with management: (i) the OCC's September 14, 2004 advisory letter to defendant Fairbank; (ii) the 2007 settlement with the FSA; (iii) the Company's ongoing issues with the PPI review and claims occurring in the United Kingdom, including the reasons behind the United Kingdom's rules and the need for Capital One to conduct a review of its records; (iv) the governmental investigations in the Company's credit card practices, including its add-on advertising, such as the California Attorney General's review and West Virginia Attorney General's review, which ultimately led to the filing and settling of an action against the Company; and (v) the consumer class action filed in the U.S. District Court for the Middle District of Florida, which had a class certified, and the filed nationwide class action.  In addition, defendant Hackett voted on the Company's conversion to a nationally chartered bank, which would have included a discussion on the regulation and oversight of the Company and what it would mean to the current investigations into Capital One.  As a member of the Board and the ARC, defendant Hackett would receive from management updates on the Federal Reserve approval process concerning the ING Direct

transaction, including the objections to the transaction, which raised the Company's improper add-on practices. In light of these numerous red flags, defendant Hackett acted disloyally in failing to take steps to cure the problems overwhelming Company's marketing practices of add-on products. Accordingly, defendant Hackett faces a substantial likelihood of liability and a demand upon her is excused.

55. Defendant Leroy is a long-time director of the Company. Like defendant Fairbank, defendant Leroy signed the Company's 2006-2011 Forms 10-K Annual Reports. In addition, defendant Leroy has been a member of the ARC since 2005. As a member of the ARC, defendant Leroy would receive updates on risk trends and new rules and regulations from the Company's management. As a result, defendant Leroy would have discussed and considered with management: (i) the 2007 settlement with the FSA; (ii) the Company's ongoing issues with the PPI review and claims occurring in the United Kingdom, including the reasons behind the United Kingdom's rules and the need for Capital One to conduct a review of its records; (iii) the governmental investigations in the Company's credit card practices, including its add-on advertising, such as the California Attorney General's review and West Virginia Attorney General's review, which ultimately led to the filing and settling of an action against the Company; and (iv) the consumer class action filed in the U.S. District Court for the Middle District of Florida, which had a class certified, and the filed nationwide class action. In addition, defendant Leroy voted on the Company's conversion to a nationally chartered bank, which would have included a discussion on the regulation and oversight of the Company and what it would mean to the current investigations into Capital One. As a member of the Board and the ARC, defendant Leroy would receive from management updates on the Federal Reserve approval process concerning the ING Direct transaction, including the objections to the transaction, which raised the Company's improper add-on practices. In light of

these numerous red flags, defendant Leroy acted disloyally in failing to take steps to cure the problems overwhelming Company's marketing practices of add-on products. Accordingly, defendant Leroy faces a substantial likelihood of liability and a demand upon him is excused.

56. Defendant Warner has been a director since 2009. Accordingly, he has signed the Company's 2009-2011 Forms 10-K Annual Reports. In addition, defendant Warner has been a member of the ARC since 2009. As a member of the ARC, defendant Warner would receive updates on risk trends and new rules and regulations from the Company's management. As a result, defendant Warner would have discussed and considered with management: (i) the 2007 settlement with the FSA; (ii) the Company's ongoing issues with the PPI review and claims occurring in the United Kingdom, including the reasons behind the United Kingdom's rules and the need for Capital One to conduct a review of its records; (iii) the governmental investigations in the Company's credit card practices, including its add-on advertising, such as the California Attorney General's review and West Virginia Attorney General's review, which ultimately led to the filing and settling of an action against the Company; and (iv) the consumer class action filed in the U.S. District Court for the Middle District of Florida, which had a class certified, and the filed nationwide class action. As a member of the Board and the ARC, defendant Warner would receive from management updates on the Federal Reserve approval process concerning the ING Direct transaction, including the objections to the transaction, which raised the Company's improper add-on practices. In light of these numerous red flags, defendant Warner acted disloyally in failing to take steps to cure the problems overwhelming Company's marketing practices of add-on products. Accordingly, defendant Warner faces a substantial likelihood of liability and a demand upon him is excused.

57. Defendants Hay and Shattuck have been directors of the Company since 2003. In addition, defendant Hay is a director of Capital One Bank. Defendants Hay and Shattuck each

signed the relevant Forms 10-K described above containing numerous red flags about the improper practices concerning the Company's add-on products for its credit cards. In addition, defendants Hay and Shattuck voted on the Company's conversion to a nationally chartered bank, which would have included a discussion on the regulation and oversight of the Company and what it would mean to the current investigations into Capital One. Further, on information and belief, defendants Hay and Shattuck either approved or were told of the lawsuit against the California Attorney General. As a members of the Board defendants Hay and Shattuck would receive from management updates on the Federal Reserve approval process concerning the ING Direct transaction, including the objections to the transaction, which raised the Company's improper add-on practices. In light of these numerous red flags, defendants Hay and Shattuck acted disloyally in failing to take steps to cure the problems overwhelming Company's marketing practices of add-on products. Accordingly, defendants Hay and Shattuck face a substantial likelihood of liability and a demand upon them is excused.

58.    In addition to facing a substantial likelihood of liability, demand is excused on defendants Fairbank, Gross, Hackett, Hay, Leroy, Shattuck, and Warner because each of these directors made the conscious decision not to act in the fact of known red flags. A decision not to act is still a decision. By failing to act in the fact of the red flags detailed herein, defendants Fairbank, Gross, Hackett, Hay, Leroy, Shattuck, and Warner allowed the illegal activity described above to continue in the Company's name. Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Further, the Board's failure to act after being alerted by numerous red flags to illegal activity occurring at the Company reflects a failure to consider all reasonably available information. Thus, for these reasons, defendants Fairbank, Gross, Hackett, Hay, Leroy, Shattuck, and Warner's decision not to act is not protected by the business judgment rule. Accordingly, demand is excused.

59.     Plaintiffs have not made any demand on the other shareholders of Capital One to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Capital One is a publicly held company with over 584 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force Plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Breach of Fiduciary Duty Against the Individual Defendants

60.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

61.     The Individual Defendants owed Capital One the fiduciary duty of loyalty and care that requires them to direct and operate Capital One in accordance with the laws applicable to its business and operations, including consumer protection laws.  However, as detailed above, while under the Individual Defendants' stewardship, Capital One used myriad of deceptive and unlawful marketing and sales tactics to sell its Payment Protection and Credit Monitoring products.  The Individual Defendants' conscious failure to ensure that Capital One's business and operations complied with consumer protection laws was in breach of their fiduciary duty.

62.     As a result, Capital One has been injured and is entitled to recover damages and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in favor of Capital One against all Defendants as follows:

A.      Declaring that Plaintiffs may maintain this action on behalf of Capital One;

B.      Directing Capital One to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Capital One and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for a shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a provision that requires the ARC to review the Company's marketing practices to ensure compliance with applicable laws, rules, and regulations;

2.      a provision that creates an officer level position that is tasked with communicating, complying, and implementing the CFPB's and OCC's laws, rules, and regulations;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

4.      a provision to permit the shareholders of Capital One to nominate at least three candidates for election to the Board;

C.      Declaring that Defendants breached their fiduciary duty of loyalty owed to Capital One;

D.      Awarding damages to Capital One against all Defendants, jointly and severally, together with interests;

E.      Awarding exemplary damages in an amount necessary to punish Defendants in an amount according to proof at trial;

F.      Awarding Capital One restitution from Defendants and each of them;

G.      Awarding Plaintiffs' costs and disbursements, including reasonable attorneys' fees;

and

H.      Granting such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: July 8, 2013

/s/ Daniel M. Cohen, Esq.
Daniel M. Cohen, Esq.
VSB# 79836
Robert J. Cynkar, Esq.
VSB# 23349
**CUNEO GILBERT & LADUCA, LLP**
106-A S Columbus Street
Alexandria, VA 22314
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

*Counsel for Plaintiffs*

**ROBBINS ARROYO LLP**
BRIAN J. ROBBINS
GEORGE C. AGUILAR
LAUREN N. OCHENDUSZKO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

**ROBEIN, URANN, SPENCER, PICARD &
    CANGEMI APLC**
MARIA CANGEMI
CHRISTINA CARROLL
2540 Severn Avenue, Suite 400
Metairie, LA  70002
Telephone: (504) 885-9994
Facsimile: (504) 885-9969

**THE WARNER LAW FIRM**
PAUL T. WARNER
11123 McCracken Lane, Suite A
Cypress, TX  77429
Telephone: (281) 664-7777
Facsimile: (281) 664-7774

*Counsel for Plaintiff Iron Workers Mid-South
Pension Fund*

**LAW OFFICE OF ALFRED G. YATES, JR., P.C**.
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 391-5164
Facsimile: (412) 471-1033

*Counsel for Plaintiff Kim Barovic*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of July, 2013, a true and correct copy of the foregoing was served by depositing a copy of same in the United States Mail, first class postage prepaid, addressed as follows:

Jordan Eth
Philip Besirof
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

*Counsel for Defendants*

John A. Trock III
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 400
McLean, VA 22102

*Counsel for Defendants*


  /s/ Daniel M. Cohen
Daniel M. Cohen (VSB# 79836)
Robert J. Cynkar (VSB# 23349)
**CUNEO GILBERT & LADUCA, LLP**
106-A S Columbus Street
Alexandria, VA 22314
Telephone: (202) 789-3960
Facsimile:  (202) 789-1813

*Counsel for Plaintiffs*

879315