**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| IN RE CAPITAL ONE DERIVATIVE SHAREHOLDER LITIGATION | )<br>)<br>) | Lead Case No. 1:12cv1100 |



## <u>MEMORANDUM OPINION</u>

At issue for the second time in this stockholder derivative action is whether the complaint—this time the Verified Consolidated Amended Complaint ("the Amended Complaint")—contains particularized allegations of bad faith breach of the duty of loyalty on the part of Capital One Financial Corporation ("Capital One") directors sufficient to excuse plaintiffs from making the requisite demand of the board of directors. Also at issue is whether the Amended Complaint's newly-alleged breach of the duty of care claim against individual defendant Richard D. Fairbank ("Fairbank") states a valid claim under Delaware law where, as here:

> (i) Capital One's certificate of incorporation contains a provision barring duty of care claims against directors except for acts committed in bad faith or in knowing violation of the law, and;

> (ii) Defendant Fairbank engaged in the challenged activity or inactivity in his capacity as both a director and a corporate officer.

For the reasons that follow, the Amended Complaint suffers the same fate as the initial complaint; it must be dismissed, this time with prejudice: (i) because the newly-alleged duty of care claim is barred by Capital One's certificate of incorporation, and (ii) because the Amended Complaint lacks particularized allegations of bad faith required by Rule 23.1, Fed.R.Civ.P., and Delaware law to excuse plaintiffs' failure to make a demand of the board of directors.

**I.**

Plaintiff shareholders Iron Workers Mid-South Pension Fund and Kim Barovic ("plaintiffs") held shares of Capital One stock at the time of the alleged wrongdoing, and both continue to hold Capital One shares. Plaintiffs initially filed separate complaints in the Circuit Court of Fairfax County, Virginia. These complaints were essentially identical, naming the same defendants and alleging essentially the same facts and precisely the same causes of action. Both cases were removed based on federal question jurisdiction to this district, where the actions were consolidated. *See In re Capital One Derivative S'holder Litig.*, 1:12-cv-1100 (E.D. Va., Nov. 30, 2012) (Order). Thereafter, defendants' first motion to dismiss was granted in part with leave to amend certain claims. *See In re Capital One Derivative S'holder Litig.*, No. 1:12-cv-1100, 2013 WL 3242685 (E.D. Va. June 21, 2013) [hereinafter "*Capital One I*"]. Plaintiffs then filed the Amended Complaint at issue here.

Capital One, the nominal defendant, is a publicly traded Delaware corporation headquartered in McLean, Virginia. Capital One is the parent company of both Capital One Bank, N.A. (USA) ("Capital One Bank USA") and Capital One Bank (Europe) Plc ("Capital One Bank Europe"). Although the suit is brought against the directors of Capital One, Capital One Bank USA is the entity alleged to have been harmed by the individual defendants' wrongdoing. And where, as here, stockholders sue the parent company of the allegedly harmed subsidiary, Delaware law recognizes and defines such a claim as a double derivative suit. *Capital One I* at *1 (citing *Sternberg v. O'Neil*, 550 A.2d 1105, 1107 n.1 (Del. 1988) (defining a double derivative action as "a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary company")). The initial separate complaints

- 2 -

included thirteen individual defendants: eight directors, four officers, and Fairbank, who is both a director and an officer.[1]   The Amended Complaint names as defendants Fairbank and seven of the eight other original Capital One director defendants: current directors[2] (1) Patrick W. Gross, (2) Ann Fritz Hackett, (3) Lewis Hay, III, (4) Pierre E. Leroy, (5) Mayo A. Shattuck, III, and (6) Bradford H. Warner, as well as (7) former director Edward R. Campbell ("Campbell") (2005-2012).   Plaintiffs allege that all individual director defendants were directors at the time the misconduct occurred and signed Capital One 10-Ks during those years.   These individual director defendants and nominal defendant Capital One are collectively referred to as "defendants."   The Amended Complaint does not name the four original officer defendants[3] or original director defendant W. Roland Dietz.

Plaintiffs' allegations in the Amended Complaint, as in the initial complaints, relate to the sale of "add-on" products sold during 2010-2012, such as "payment protection insurance" and "credit monitoring," which the Office of the Comptroller of the Currency ("OCC") and the Consumer Financial Protection Bureau ("CFPB") subsequently concluded were sold using deceptive sales practices.   Plaintiffs' initial complaints alleged that the directors and officers of Capital One (i) breached their fiduciary duty of loyalty, (ii) committed corporate waste, and (iii) were unjustly enriched when they failed to prevent allegedly deceptive sales practices at Capital

---

[1] Fairbank has been a director of Capital One since 1994 and is also Capital One's Chief Executive Officer and President.

[2] For the purpose of demand futility analysis, "current" means that individual defendants were Capital One directors at the time that plaintiffs filed the Amended Complaint—July 8, 2013.

[3] The initial complaints named as defendants the following Capital One officers: (1) Peter A. Schnall, the Chief Risk Officer since 2006, and prior to that the Chief Credit Officer; (2) Ryan M. Schneider, the President of Capital One's Card division since 2007, and an Executive Vice President prior to that time; (3) Sanjiv Yajnik, the President of Financial Services since 2009, and an employee of Capital One's European and Canadian credit card businesses from 1998 until 2009; and (4) Gary L. Perlin, the Chief Financial Officer since 2003.

One's third-party call centers.   As a result of defendants' first motion to dismiss, plaintiffs'

claims for corporate waste and unjust enrichment were dismissed for failure to state a claim upon

which relief can be granted pursuant to Rule 12(b)(6), Fed.R.Civ.P.   *See Capital One I* at *7-*8.

In addition, all claims against Capital One officers were dismissed because the facts pled in the

complaints did not excuse plaintiffs from making demand on the board of directors to bring suit,

as required by Rule 23.1.   *See id.* at *15.   Further, plaintiffs' initial complaints advanced two

alternative theories in their duty of loyalty claim against Capital One directors and officers: (i) a

*Caremark*[4] claim alleging that defendants failed to implement adequate controls that would have

prevented the wrongdoing, and (ii) failure to address the wrongdoing despite being alerted to it

by eight separate red flags.   The *Caremark* claim was dismissed for failure to state a claim

pursuant to Rule 12(b)(6).[5]   *See id.* at *10.   Similarly, plaintiffs' claims for breach of the duty of

loyalty based on three of the alleged red flags were dismissed for failing to relate to valid red

flags under Delaware law.   *See id.* at *11-*12.   Although the remaining five alleged red flags

qualified as red flags under Delaware law, plaintiffs' duty of loyalty claims based on these red

flags were dismissed with leave to amend because the initial complaints lacked the particularized

allegations Rule 23.1 requires to excuse demand.[6]   *See id* at *14-*18.

---

[4] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[5] The *Caremark* claim was dismissed because it was clear that there was no widespread
"sustained or systematic failure of the board to exercise oversight." *Capital One I* at *10 (citing
*Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006)).   Yet, plaintiffs
did plead facts giving rise to a plausible inference that the director defendants failed to exercise
oversight in response to narrow, discrete red flags. *See id.* at *11.

[6] These five remaining red flags were: (1) Capital One Bank Europe's 2007 settlement with the
British Financial Services Authority ("FSA"); (2) Capital One's 2012 settlement with the West
Virginia Attorney General; (3) settlements in a series of class actions concerning Capital One's
payment protection plans; (4) formal inquiries from various governmental agencies related to the

In sum, the Amended Complaint—like the original complaints—focuses on misrepresentations made in third-party call centers during the sale of add-on products and alleges a breach of the duty of loyalty claim.[7]  But unlike the original complaints, the Amended Complaint alleges a new breach of the duty of care claim against defendant Fairbank and four new red flags that plaintiffs contend should have alerted the individual defendants to the wrongdoing.[8]   In this second motion to dismiss, defendants assert: (i) that plaintiffs impermissibly exceeded their leave to amend by alleging new red flags and the duty of care claim; (ii) that Capital One's certificate of incorporation precludes the newly-alleged duty of care claim against Fairbank; and (iii) that the duty of loyalty claims fail because plaintiffs have not pled with particularity an acceptable reason for declining to make demand of the directors, as required by Rule 23.1.  The question presented is whether the Amended Complaint meets the pleading standards of Rule 23.1 and Delaware law.

---

payment protection products; and (5) settlements between two of Capital One's competitors and various regulatory agencies.

[7] The Amended Complaint permissibly re-alleges three of the five red flags that survived the first motion to dismiss: (1) Capital One Bank Europe's 2007 settlement with the British FSA; (2) Capital One's 2012 settlement with the West Virginia Attorney General; and (3) settlements in a series of class actions concerning Capital One's payment protection plans.  Notably, plaintiffs have elected not to re-plead two of the red flags for which they were explicitly granted leave to amend: (1) formal inquiries from various governmental agencies related to the payment protection products; and (2) settlements between two of Capital One's competitors and various regulatory agencies.

[8] The Amended Complaint's four new red flags are: (1) a 2004 OCC advisory letter ("OCC letter"); (2) an investigation by the California Attorney General commenced in 2006; (3) a 2007 investigation by the British Competition Commission of the Office of Fair Trading that prompted a change in the United Kingdom's regulation of payment protection insurance; and (4) consumer grievances voiced during public hearings held during Capital One's acquisition of ING Direct in 2011.

## II.

It is necessary to address briefly at the threshold whether, as defendants argue, the Amended Complaint should be dismissed because it exceeds the scope of the allowed leave to amend. To be sure, defendants correctly point out that plaintiffs exceeded the scope of the leave to amend granted to them, specifically by alleging four new red flags and the newly-alleged breach of the duty of care claim. Yet, it does not follow that dismissal is appropriate. To the contrary, judicial economy points persuasively to the opposite result. To conclude otherwise would require plaintiffs to pursue the Rule 15, Fed.R.Civ.P. amendment process. And given that "leave to amend shall be given freely, absent bad faith, undue prejudice to the opposing party, or futility of amendment,"[9] it is likely that plaintiffs would succeed in obtaining leave to amend. In the interest of judicial economy, therefore, this opinion will focus solely on whether plaintiffs' (i) breach of the duty of care claim against director Fairbank and (ii) breach of the duty of loyalty claims against the defendant directors meet the relevant pleading standards.

## III.

Analysis of the Amended Complaint's adequacy properly begins with defendants' contention that the exculpatory clause in Capital One's certificate of incorporation bars plaintiffs' newly-alleged claim for breach of the duty of care against defendant Fairbank. Although claims for breaches of the duty of care are generally governed by a gross negligence standard,[10] Capital One's certificate of incorporation provides that its directors may be held liable only for breaches of the duty of loyalty or "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."   Restated Certificate of

---

[9] *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000).

[10] *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 122 (Del. Ch. 2009).

Incorporation, Capital One Fin. Corp., art. X, May 16, 2011. And, as noted in *Capital One I*, "[s]uch limitations are permissible and effective under Delaware law." *Capital One I* at *8 (citing 8 Del. C. § 102(b)(7)).[11] Thus Fairbank, when he acts in his capacity as a Capital One director, is shielded from liability for breaches of the duty of care unless his actions are (i) not in good faith, (ii) involve intentional misconduct, or (iii) involve a knowing violation of the law. In other words, absent bad faith, intentional misconduct, or a knowing violation of the law, Fairbank cannot be liable for breaches of the duty of care when he acts as a director. It follows that to state a claim against Fairbank for breach of the duty of care where, as here, there are no allegations of bad faith, intentional misconduct, or knowing violation of the law, plaintiffs must plead facts plausibly alleging that he acted *solely* in his capacity as an officer, thereby removing his actions from protection under the exculpatory clause. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (noting that if a defendant is an officer and a director, only actions taken "solely in the defendant's capacity as an officer" may give rise to liability for acts for which section 102(b)(7) shields directors from liability).

In an attempt to circumvent the charter provision and thus subject Fairbank to the lower gross negligence standard, plaintiffs in the Amended Complaint allege that Fairbank was acting *solely* in his capacity as CEO of Capital One when he failed to take action in response to the alleged red flags. Specifically, plaintiffs allege that Fairbank was acting *solely* in his capacity as an officer when he: (i) received the OCC letter, which plaintiffs allege is a red flag; (ii)

---

[11] Del. C. § 102(b)(7) provides that corporations' certificates of incorporation may contain provisions "eliminating or limiting the personal liability of a director to the corporation or its stockholders . . . provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit."

participated in the ING Direct acquisition, during which the public voiced grievances that plaintiffs allege are red flags; and (iii) certified the relevant Capital One 10-Ks, which disclose the remaining five alleged red flags.[12]  These allegations fall short.  The duty of care claim against Fairbank fails because plaintiffs have neither pled facts, nor forecasted facts, that would support an inference that Fairbank acted in bad faith or that he was acting *solely* in his capacity as an officer when he acted or failed to act as alleged.  Plaintiffs have also failed to meet the lower bar for pleading gross negligence with regard to the one potentially non-exculpated action.

First, although the nationwide OCC advisory letter on deceptive credit card practices was sent to Fairbank in his capacity as CEO,[13] the Amended Complaint alleges that other director defendants should have received the letter in their capacity as board members on the Audit and Risk Committee.[14]  Am. Compl. ¶ 35.  This allegation negates any inference that Fairbank received the letter *solely* in his capacity as an officer or that he acted or failed to act in response to the letter *solely* in his capacity as an officer.  Moreover, even assuming that Fairbank did receive the OCC letter *solely* in his capacity as an officer, plaintiffs' allegations fall short of

---

[12] The remaining five red flags alleged in the Amended Complaint are: (1) Capital One Bank Europe's 2007 settlement with the British FSA; (2) Capital One's 2012 settlement with the West Virginia Attorney General; (3) settlements in a series of class actions concerning Capital One's payment protection plans; (4) an investigation by the California Attorney General commenced in 2006; and (5) a 2007 investigation by the British Competition Commission of the Office of Fair Trading that prompted a change in the United Kingdom's regulation of payment protection insurance.

[13] The letter was sent to "Chief Executive Officers of All National Banks, Department and Division Heads, and All Examining Personnel." *In re Capital One Derivative S'holder Litig.*, 1:12-cv-1100 (E.D. Va., July 26, 2013) (Besirof Decl., Ex. 1, "OCC Advisory Letter"). Although not attached to the Amended Complaint, documents such as the OCC letter "may [be] consider[ed] in determining whether to dismiss the complaint because [they are] integral to and explicitly relied on in the complaint and because the [opposing parties] do not challenge [the] authenticity" of the documents. *Phillips v. LCI Intl., Inc.*, 190 F. 3d 609, 618 (4th Cir. 1999).

[14] Plaintiffs allege that director defendants Gross, Hackett, Leroy, and Warner were members of the Audit and Risk Committee during the relevant time period. Am. Compl. ¶ 24.

Case 1:12-cv-01100-TSE-TCB   Document 75   Filed 10/08/13   Page 9 of 24 PageID# 1468

meeting the gross negligence standard required to state a breach of the duty of care claim. *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64 (Del. 2006) (defining lack of due care as "fiduciary action taken solely by reason of gross negligence and without any malevolent intent"). Because the OCC letter does not involve conduct sufficiently similar to the alleged misconduct at the third-party call centers to have put Fairbank on notice of that misconduct, failing to take specific action in response to the OCC letter cannot constitute gross negligence (*see* discussion *infra*, Part IV.A). Accordingly, even if Fairbank received the OCC letter *solely* in his capacity as an officer, plaintiffs have not pled with particularity facts to show that Fairbank acted with the gross negligence required for a cognizable breach of the duty of care claim.

The next alleged basis for the duty of care claim against Fairbank is his involvement in the ING Direct acquisition, which involved public hearings that included the airing of numerous consumer grievances. This claim fails because the ING Direct acquisition hearings, like the OCC letter, did not reveal any information that could have reasonably alerted Fairbank to the alleged misconduct at the third-party call centers. *See infra* Part IV.A. Fairbank's action or lack of action in response to those hearings thus cannot form the basis of a gross negligence claim. Moreover, plaintiffs have failed to plead or forecast any facts that would give rise to a plausible inference that Fairbank participated in the acquisition process *solely* in his capacity as an officer. To the contrary, the Amended Complaint specifically alleges that "[d]ue to the size of the transaction, it required Board approval and the Board needed to monitor the purchase process." Am. Compl. ¶ 43-45. Consistent with this, plaintiffs, in their brief, assert that "[d]efendants Fairbank, Gross, Hackett, Hay, Leroy, Shattuck, and Warner would receive from management updates on the Federal Reserve approval process concerning the ING Direct transaction." Pls.' Opp'n Br. at 19. This assertion contradicts any claim that Fairbank's actions with respect to the

- 9 -

ING Direct acquisition were taken *solely* in his capacity as an officer and not also as Chairman of the Board.

The third basis for the duty of care claim against Fairbank is the allegation that he approved Capital One 10-Ks during the years in which the alleged misconduct at the third-party call centers occurred *solely* in his capacity as an officer. These 10-Ks disclose the remaining five of the total seven red flags alleged in the Amended Complaint, four of which are determined *infra* to qualify as red flags (*see infra* Part IV.A). Yet, this basis for the duty of care claim fails at the threshold as it is clear that Fairbank signed the relevant 10-Ks as "Chairman of the Board, Chief Executive Officer, and President." *In re Capital One Derivative S'holder Litig.*, 1:12-cv-1100 (E.D. Va., Nov. 19, 2012) (Cohen Decl., Ex. 9, "Capital One 2007 10-K," Ex. 10 "Capital One 2009 10-K").[15] This plain language flatly refutes any inference that Fairbank signed the 10-Ks *solely* in his capacity as a Capital One officer; the 10-Ks themselves reflect that Fairbank signed the documents in his dual capacity as both an officer and a director. Thus, plaintiffs have neither pled facts, nor forecasted facts, giving rise to any plausible inference that Fairbank signed the relevant 10-Ks *solely* in his capacity as an officer.

In sum, two of the three actions that plaintiffs allege Fairbank engaged in *solely* in his capacity as a CEO are insufficient to have alerted Fairbank to the misrepresentations at the third-party call centers and hence cannot give rise to a plausible inference of gross negligence, which is required to constitute a duty of care claim. *See Disney*, 906 A.2d at 64. Moreover, plaintiffs have neither pled facts, nor forecasted facts, alleging that Fairbank's actions in connection with the OCC letter, the ING Direct acquisition, and the 10-Ks were actions taken *solely* in his capacity as an officer, as Delaware law requires. *See Arnold*, 650 A.2d at 1288. Given this,

---

[15] The 10-Ks may be considered in determining whether to dismiss the complaint. *See supra* note 13.

plaintiffs are required to allege bad faith, rather than gross negligence as they contend,[16] in order

to give rise to an inference of substantial likelihood of director liability. As discussed *infra* in

Part. IV.B, plaintiffs have failed to plead that the director defendants acted in bad faith in

connection with the alleged red flags. The duty of care claim therefore fails as barred by the

certificate of incorporation provision.[17]

## IV.

The analysis proceeds next to the important question whether the shareholder plaintiffs

may dispense with the substantive and procedural requirement that they make demand on the

board of directors to have the corporation sue the individual director defendants before plaintiffs

can step into the shoes of the directors to sue derivatively on the corporation's behalf. Because

board control over a corporation is an axiomatic principle of corporate law, Rule 23.1(b)(3)

provides enhanced pleading standards requiring that shareholder plaintiffs "state with

particularity" (i) that they have demanded that the board file a suit asserting the corporation's

rights, or (ii) "the reasons for not . . . making the effort" to demand action from the board of

directors before shareholders may bring suit on behalf of the corporation. The director demand

requirement is premised on the "basic principle of corporate governance that the decisions of a

corporation—including the decision to initiate litigation—should be made by the board of

directors," not the shareholders. *Kamen v. Kemper Financial Srvc. Inc.*, 500 U.S. 90, 101

(1991). And because this matter is in federal court, Rule 23.1 establishes the applicable

---

[16] Am. Compl. ¶ 52.

[17] It is unnecessary to conduct an analysis under Rule 23.1 with respect to plaintiffs' duty of care claim against defendant Fairbank because the allegation fails to state a claim under Delaware law. Yet, even if the duty of care claim against Fairbank stated a valid claim under Delaware law, it would not survive Rule 23.1 because, as elucidated *infra*, plaintiffs have failed to plead demand futility with particularity in accordance with Delaware law.

procedural pleading standards, namely that any alleged futility of demand must be pled with particularity. Yet, state law, not Rule 23.1, determines the substantive standard that shareholders must meet to plead adequately their reason for failing to make demand on the board of directors before bringing suit. *Firestone v. Wiley*, 485 F. Supp. 2d 694, 701 (E.D. Va. 2007) (citing *Kamen*, 500 U.S. at 108-09). Here, because Capital One is incorporated in Delaware, Delaware law determines whether plaintiffs may bring an action on Capital One's behalf. *See id.*[18] Under Delaware law, "directors are entitled to a *presumption* that they were faithful to their fiduciary duties," and when plaintiffs fail to make demand, plaintiffs bear the burden of overcoming that presumption by demonstrating demand futility. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004). Put differently, shareholders are excused from making demand of the board of directors when they plead with particularity that doing so would be futile. *See Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). Significantly, settled Delaware law makes clear that futility is not easy to plead or demonstrate. Where, as here, a board of directors is alleged to have violated its oversight duties, rather than to have engaged in a conscious business decision, plaintiffs, under Delaware law, must plead "particularized facts establishing a reason to doubt that 'the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *Id.* (citing *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)). And to plead particularized facts establishing a reasonable doubt that the directors could act independently, plaintiffs must demonstrate not just

---

[18] Because Capital One is incorporated under the laws of the state of Delaware, Delaware law governs the internal affairs of the corporation, including specifically the criteria for assessing the adequacy of a claim that a demand on Capital One's directors would be futile. *See Kamen*, 500 U.S. at 108–09 (holding that in analyzing the futility exception in a derivative action, a court must apply the demand futility exception as it is defined by the law of the state of incorporation); *Firestone*, 485 F. Supp. 2d at 701 (noting that *Kamen* held that federal courts must apply the demand futility exception provided by the law of the state of incorporation).

that the directors face some risk of liability in the pending suit, but that their actions were so egregious that "*a substantial likelihood of director liability*" exists.[19] *Aronson v. Lewis,* 473 A.2d 805, 815 (Del. 1984) (emphasis added) (overruled on other grounds in *Brehm v. Eisner,* 746 A.2d 244 (Del. 2000)); *see also Wood,* 953 A.2d at 140-41, n.11. It remains, now, to apply this standard to the Amended Complaint.

To begin with, former director Campbell must be excluded from the demand futility analysis, as that analysis turns only on whether a majority of the *current* board of directors is unable to exercise independent and disinterested business judgment in assessing a shareholder demand. *See Aronson,* 473 A.2d at 810 ("[F]utility is gauged by the circumstances existing at the commencement of a derivative suit."). Thus, to demonstrate demand futility, plaintiffs have the burden of pleading with particularity that six of the seven director defendants who currently serve on the ten-member Capital One board[20] are unable to exercise "independent and disinterested business judgment,"[21] because of "a substantial likelihood of director liability."[22] More specifically, to survive the dismissal motion, the Amended Complaint must contain particularized allegations that show that a majority of the current Capital One board members is unable to exercise independent and disinterested judgment as to whether Capital One should sue

---

[19] The stringency of this standard reflects the considered judgment of Delaware's legislature and courts that shareholder derivative suits should only be allowed in exceptional circumstances. Critics of corporate governance can certainly muster policy arguments to the contrary, and there is no doubt that more frequent shareholder derivative suits would be a boon to lawyers. But it is not the role of federal courts, in evaluating diversity suits, to second guess Delaware's legislature and courts on this important issue.

[20] The remaining three members of the ten-member Capital One board of directors are not named as defendants, and plaintiffs have not alleged that they are unable to exercise independent and disinterested business judgment.

[21] *Rales,* 634 A.2d at 934.

[22] *Aronson,* 473 A.2d at 815.

because there is a substantial likelihood that each of those directors will be liable for breach of the duty of loyalty for failing to take steps to stop third-party call centers from engaging in the wrongful conduct. It follows that the analysis should proceed to assessing whether the Amended Complaint's allegations pass muster under this standard and thereby establish that there is a substantial likelihood of liability with respect to each of the directors individually.

As noted in *Capital One I*, breaches of the duty of loyalty typically involve a claim of conflict of interest between one or more of the directors or officers and the company or shareholders as a whole. *Capital One I* at *8. As the Supreme Court of Delaware has noted, "[e]ssentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994). No such conflict of interest is alleged here. But it is also true that under Delaware law, the duty of loyalty requires a corporation's officers and directors to act in good faith with respect to the company. As one court put it: "[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith." *Stone*, 911 A.2d at 70. It follows that the Amended Complaint must include allegations that the defendant directors' acts or failures to act were infected with bad faith. Importantly, this is a difficult standard to meet because "an extreme set of facts is required to sustain a disloyalty claim" premised on the notion that directors were disregarding their duties. *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

Plaintiffs contend in the Amended Complaint that the Capital One directors violated the law when third-party call center employees made certain misrepresentations to customers, which

the director defendants failed to prevent. Significantly, plaintiffs have not alleged that the defendant directors were personally involved in any misrepresentations made to customers regarding the add-on products; rather, plaintiffs allege (i) that misrepresentations occurred when the third-party call centers' employees spoke with customers, (ii) that these "violations [at the call centers] occurred on Individual Defendants' watch," and (iii) that "[b]y failing to act after numerous red flags concerning Capital One's credit card 'add-on' product sales practices, Defendants damaged the Company." *See* Am. Compl. ¶ 7. The heart of this claim is plaintiffs' allegation that the director defendants were aware of certain "red flags" that should have alerted defendants to problems at the third-party call centers, but the director defendants consciously decided not to heed the red flags, investigate the conduct, and correct the call centers' practices. Specifically, plaintiffs identify seven potential red flags in the Amended Complaint. Although the Amended Complaint adequately pleads that four incidents could have served as red flags to alert the director defendants to wrongdoing at the third-party call centers, the Amended Complaint fails to plead, as required, the knowledge and bad faith requirements as to each of the individual directors. *See Desimone v. Barrows,* 924 A.2d 908, 943 (Del. Ch. 2007).

## A. Red Flag Eligibility

To begin with, there is the issue of what constitutes a red flag under Delaware law. As noted in *Capital One I*, settled Delaware authority makes clear than an event or information constitutes a red flag only where there is a "clear warning" that should put defendants on notice, "alerting [them] to potential misconduct at the Company." *Capital One I* at *11 (citing *Citigroup,* 964 A.2d at 128). In other words, the events or information alleged to be a red flag must involve or relate to conduct sufficiently similar to the wrongful conduct at the third-party call centers to alert a reasonable director to potential misconduct at the call centers. As noted in

*Capital One I*, red flags that are not sufficiently similar will not suffice. *Capital One I* at \*11. Of the seven red flags alleged in the Amended Complaint, only four pass muster as red flags because they involve conduct sufficiently similar to the misrepresentations at the third-party call centers.

The first alleged red flag occurred in 2007 when the British FSA imposed a £175,000 fine on Capital One Bank Europe for providing inadequate information to customers who purchased payment protection insurance. Am. Compl. ¶ 38. This conduct bears some resemblance to the allegations of wrongdoing at the third-party call centers. At the same time, however, the FSA notice states that Capital One "ensur[ed] efficient resolution of the matter," and that "Capital One's response to the investigation was a model for how firms should behave." *In re Capital One Derivative S'holder Litig.*, 1:12-cv-1100 (E.D. Va., Nov. 5, 2012) (Besirof Decl. Ex. 3, "FSA Final Notice," ¶ 5.18-5.19).[23] Defendants therefore could have reasonably believed that the matter was resolved. In order words, the FSA fine may constitute a red flag, but this flag was arguably lowered prior to the misconduct alleged in the Amended Complaint. Nevertheless, the FSA notice merits consideration as a red flag here because the conduct that warranted the fine could plausibly have alerted the director defendants to the alleged wrongdoing at the third-party call centers.

Capital One's 2012 settlement with the West Virginia Attorney General constitutes the second alleged red flag. Am. Compl. ¶ 36. Plaintiffs allege that the Attorney General of West Virginia initiated an investigation into the marketing and sale of Capital One's add-on products, in particular payment protection insurance, in 2005. The state filed suit against Capital One in 2010, which resulted in a $13.5 million settlement in 2012. Because the conduct at issue in the

---

[23] The FSA notice may be considered in determining whether to dismiss the complaint. *See supra* note 13.

lawsuit is substantially similar to the misrepresentations in the third-party call centers, the settlement with the West Virginia Attorney General could constitute a red flag.

Plaintiffs assert that settlements in a series of class actions concerning Capital One's payment protection plans should serve as a third red flag. Am. Compl. ¶ 42. In the Amended Complaint, plaintiffs enumerate several consumer class actions against Capital One over marketing practices related to add-on products. Plaintiffs specifically cite a case removed to the Middle District of Florida in 2008. Because the subject of the suits—marketing practices used to sell add-on products—is substantially similar to the conduct at issue in this derivative suit, the class actions meet the red flag requirement.

The fourth purported red flag is a 2007 investigation by the British Competition Commission that prompted a change in the United Kingdom's regulation of payment protection insurance. Am. Compl. ¶ 39-41. On January 29, 2009, the Competition Commission published a 317-page report titled "Market investigation into payment protection insurance." *In re Capital One Derivative S'holder Litig.*, 1:12-cv-1100 (E.D. Va., July 26, 2013) (Besirof Decl., Ex. 2, "Competition Commission: Market Investigation into Payment Protection Insurance"). The report covers the entire payment protection insurance market, rather than focusing specifically on Capital One products or sales practices. The report references Capital One several times as a participant in the payment protection insurance market with 0-5% market share in 2006-2008. *Id.* at 30. The report further references information that the Competition Commission had elicited directly from Capital One, indicating that Capital One had cooperated with the investigation.[24]  Plaintiffs allege that Capital One ceased the sale of payment protection

---

[24] For example, the report provides: "We decided that the point-of-sale prohibition should not be modified as Capital One suggested, though the duration of the point-of-sale prohibition was reduced compared with the length of prohibition on which Capital One commented, and we have

insurance in the United Kingdom because the regulatory changes proposed in the report were scheduled to take effect, and that Capital One booked a substantial reserve to cover consumer claims in the UK under the new rules. The Competition Commission report covers conduct substantially similar to the misconduct complained of in the third-party call centers, and it thus qualifies as a red flag.

Plaintiffs contend that the 2004 OCC letter constitutes a fifth red flag. Am. Compl. ¶ 35. The OCC advisory letter is a general warning letter sent to all national banks alerting them to the OCC's concern that "certain credit card marketing and account management practices . . . may entail unfair or deceptive acts or practices." *In re Capital One Derivative S'holder Litig.*, 1:12-cv-1100 (E.D. Va., July 26, 2013) ( Besirof Decl., Ex. 1, "OCC Advisory Letter"). The letter details three such practices: credit cards that advertise credit limits "up to" a maximum dollar amount, soliciting credit cards using promotional rates without clear disclosures on the applicability of those rates, and increasing a cardholder's cost of credit without making the circumstances of the increase clear. None of these three practices is sufficiently similar to the alleged misrepresentations at the calls centers. Therefore, the OCC letter does not constitute a red flag.

A 2006 investigation by the California Attorney General serves as plaintiffs' sixth alleged red flag. Am. Compl. ¶ 37. Specifically, plaintiffs allege that in November 2006, the California Attorney General launched an investigation because of "substantial concerns about the credit card practices of Capital One." *Id.* The investigation terminated in March 2008 when Capital

---

accepted some of Capital One's suggestions in relation to the personal [payment protection insurance] quote." *In re Capital One Derivative S'holder Litig.*, 1:12-cv-1100 (E.D. Va., July 26, 2013) (Besirof Decl., Ex. 2, "Competition Commission: Market Investigation into Payment Protection Insurance," at 216). The Competition Commission report may be considered in determining whether to dismiss the complaint. *See supra* note 13.

One converted its charter to that of a national banking association, causing the California Attorney General to lose jurisdiction. Plaintiffs do not allege that the investigation related to the wrongdoing at third-party call centers, nor do they allege that the investigation sought information on credit card add-on products. Allegations pertaining to this putative red flag are therefore not sufficiently specific to give rise to an inference that the investigation served as a clear warning that should have put defendants on notice of wrongdoing at the third-party call centers.

Finally, plaintiffs allege that defendants should have been alerted by consumer grievances expressed during public hearings held by the Federal Reserve during Capital One's acquisition of ING Direct in 2011, and that these hearings thus constitute a seventh red flag. Am. Compl. ¶ 43-45. At these hearings, some consumers voiced general grievances about Capital One's alleged "predatory" or "abusive" credit card practices. Some consumer advocates referred to investigations of Capital One and lawsuits against the company. Some consumers lodged specific complaints about their experience with Capital One's payment protection insurance products. None of these grievances, however, were sufficiently similar to the misconduct alleged here to have put defendants on notice of wrongdoing at the third-party call centers. General grievances about Capital One's credit card practices are not sufficiently specific. Similarly, general consumer complaints regarding ongoing investigations and lawsuits do not reveal any *new* information about those investigations and lawsuits, beyond the information already available to the board of directors. And although some consumers did complain specifically about their experience with Capital One's payment protection insurance product, there is no allegation that they complained about *misleading or deceptive marketing of those products*, which is the misconduct at issue in this suit. General grievances about poor consumer

- 19 -

experiences with payment protection insurance are not sufficiently similar to the alleged illegal misrepresentations by the third-party call centers and hence cannot serve as a red flag.

In sum, four of the seven alleged red flags plausibly could have alerted defendants to wrongdoing at the third-party call centers: (1) Capital One Bank Europe's 2007 settlement with the British FSA; (2) Capital One's 2012 settlement with the West Virginia Attorney General; (3) the series of class actions concerning Capital One's payment protection plans; and (4) the 2007 investigation by the British Competition Commission that prompted a change in the United Kingdom's regulation of payment protection insurance.

### B. Bad Faith

This does not end the analysis on whether the breach of the duty of loyalty claim based on red flags has been adequately pled.  As noted in *Capital One I*, Rule 23.1 further requires plaintiffs to plead with particularity that each individual director was aware of the red flags and failed to act on them in bad faith.  *Capital One I* at \*12-\*13.  As the Delaware Chancery Court has stated, "[a] determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants." *Citigroup*, 964 A.2d at 134.  Put differently, under Delaware law, "a derivative complaint must plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Desimone*, 924 A.2d at 943 (emphasis in original).  In order for the four red flag candidates to have warned the directors of wrongdoing at Capital One, the directors must have somehow become aware of these red flags. *See Wood*, 953 A.2d at 143.  Here, even assuming that each of the individual directors were aware of the four eligible red flags through disclosure in Capital One's 10-Ks and membership on Capital One's Audit and Risk Committee as plaintiffs allege,

the duty of loyalty claim falls short because plaintiffs do not allege with particularity that the individual director defendants failed to act on the red flags in bad faith.

Delaware law also dictates that "the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest," but "also encompasses cases where the fiduciary fails to act in good faith." *Stone*, 911 A.2d at 370. This is so because "[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003). Thus, where, as here, plaintiffs have alleged a breach of the duty of loyalty that does not arise out of a fiduciary conflict of interest, plaintiffs must plead and prove more than negligence or misfeasance; they must plead and prove bad faith by showing that the "directors fail[ed] to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Stone*, 911 A.2d at 370. In other words, "the intentional dereliction of duty or the conscious disregard for one's responsibilities [amounts to] bad faith conduct, which results in a breach of the duty of loyalty." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008). And, like the requirement to plead knowledge of red flags, bad faith must be pled with respect to each director individually. *See Citigroup*, 964 A.2d at 134; *Desimone*, 924 A.2d at 943. Plaintiffs have not pled or forecasted any particularized facts suggesting that the directors failed to act in the face of a known duty to act; hence, the Amended Complaint does not meet the bad faith requirement.

In their Amended Complaint, plaintiffs allege knowledge on the part of the individual defendants based on the following factors: (i) that individual defendants signed Capital One 10-Ks disclosing the alleged red flags: (ii) that four of the individual defendants were members of Capital One's Audit and Risk Committee, and (iii) that individual defendants "would have"

- 21 -

received updates on and discussed the alleged red flags due to the nature of their positions as directors. Am. Compl. ¶ 52-57. These factors warrant the conclusion, plaintiffs assert, that "each of the directors made the conscious decision not to act in the face of known red flags." Am. Compl. ¶ 58. Yet, these allegations fail to include the required "analysis of the state of mind of the individual director defendants," *Citigroup,* 964 A.2d at 134, that would give rise to an inference that the "directors fail[ed] to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Stone,* 911 A.2d at 370. Rather, "the plaintiffs' complaint seeks to equate a bad outcome with bad faith," an inference that the Supreme Court of Delaware has expressly held falls short of meeting the requirement for pleading bad faith. *Id.* at 373.

Two recent decisions, *Louisiana Mun. Police Employees' Ret. Sys. v. Pyott*[25] and *Westmoreland v. Parkinson*[26] have held that the plaintiffs in those cases met the high bar under Delaware law of pleading that directors acted in bad faith in their failure to remedy misconduct. Both cases are distinguishable. In *Pyott,* the Delaware Court of Chancery found that the plaintiffs pled "facts [that] can support a reasonable inference that directors *in fact* approved a business plan that contemplated [the alleged misconduct]." 46 A.3d at 357-58. This was because "the Complaint [did] not merely allege that [the] misconduct took place. . . . [T]he Complaint support[ed] these allegations with references to internal [company] books and records." *Id.* at 353. Similarly, in *Westmoreland,* in which the nominal defendant corporation was operating under a U.S. Food and Drug Administration ("FDA") consent decree, plaintiff

---

[25] 46 A.3d 313, 357-58 (Del. Ch. 2012) *rev'd on other grounds*, No. 380, 2012, 2013 WL 1364695 (Del. Apr. 4, 2013). The Supreme Court of Delaware reversed the opinion on collateral estoppel grounds and thus never addressed the Delaware Court of Chancery's demand futility analysis.

[26] 12-3342, 2013 WL 4266586 (7th Cir., Aug. 16, 2013).

alleged that "the directors knowingly steered [the corporation] on a course that was all but certain to prompt the FDA to take enforcement action under the . . . Consent Decree." 2013 WL 4266586 at *7. To support this claim, "the complaint allege[d] particularized facts (*e.g.,* meeting dates and minutes) indicating that the directors were intimately involved in overseeing the remedial effort." *Id.*

Plaintiffs' Amended Complaint fails to meet the high bar for pleading bad faith that *Pyott* and *Westmoreland* elucidate. In both cases, the court found that plaintiffs pled particularized factual allegations demonstrating that the defendant directors consciously failed to respond when they knew that doing so was inconsistent with a legal obligation. No such particularized factual allegations exist here. Plaintiffs' claims in the Amended Complaint are limited to bare assertions that: (i) red flags existed, (ii) the individual defendants must have known about these red flags because their positions as directors required them to know about the operation of the corporation, and (iii) bad faith can be inferred from the fact that the alleged misconduct "occurred on Individual Defendants' watch"[27] and was not remedied. Yet, it is not sufficient to plead, as plaintiffs have done here, that defendant directors *would have* discussed the misrepresentations at the third-party call centers at regularly scheduled board meetings. Rather, plaintiffs must plead *particularized* facts showing that defendant directors *actually* knew of the wrongdoing, and, in possession of that knowledge, that they *consciously* chose not to remedy the misconduct. Plaintiffs have failed to meet that burden.

The conclusion reached here is thus the same as that reached in *Capital One I*. Plaintiffs have failed to plead with particularity that making demand of the board would be futile. They have failed to plead particularized facts indicating that a majority of the current board of

---

[27] Am. Compl. ¶ 7.

- 23 -

directors face a substantial likelihood of liability and would therefore be unable to evaluate independently a demand that they authorize the corporation to sue some or all members of the board of directors. Therefore, the suit must be dismissed in accordance with Rule 23.1.

## V.

In summary, the Amended Complaint fails because: (i) Capital One's certificate of incorporation bars the newly-alleged duty of care claim against Fairbank, and (ii) the shareholder plaintiffs are not entitled to wrest control of the corporation from the board to sue derivatively on behalf of the corporation because they have not pled with particularity that demand would be futile as required by Rule 23.1 and Delaware law. Accordingly, defendants' second motion to dismiss this matter must be granted.

An appropriate Order will issue.

/s/ 10/8/13

T. S. Ellis, III
United States District Judge